RELIABLE VOLKSWAGEN SALES AND
SERVICE COMPANY, Inc., Plaintiff,

v.

WORLD-WIDE AUTOMOBILE CORP.,
Fifth Avenue Motors, Inc., Queensboro
Motors Corp., Volkswagen of America,
Inc., Volkswagen United States, Inc.,
Volkswagenwerk, G.m.b.H., Charles J.
Dillon and Arthur Stanton, Defendants.

Civ. A. Nos. 132-59 and 554-60.

United States District Court
D. New Jersey.
April 11, 1963.

Davis & Roth, Jersey City, N. J., for plaintiff, and Louis G. Greenfield, and Sidney W. Rothstein, New York City, of counsel.

Crummy, Gibbons & O'Neill, Newark, N. J., for defendants Volkswagenwerk, G.m.b.H. and Volkswagen of America, Inc., John J. Gibbons, Newark, N. J., Herzfeld & Rubin, New York City, of counsel, by Herbert Rubin, Walter Herzfeld, New York City, and Rita E. Hauser, Washington, D. C.

Arthur L. Abrams, Newark, N. J., for defendants World-Wide Automobiles Corp., Fifth Avenue Motors, Inc., Queensboro Motors Corp., Charles J. Dillon and Arthur Stanton, Mervin Rosenman, New York City, of counsel.

WORTENDYKE, District Judge.

Plaintiff filed two actions of a similar nature against the defendants; one in the Southern District of New York, and one in this District. The former having been transferred to this Court, the two

cases were consolidated for trial, on June 30, 1960. Among the various causes of action alleged, one (Count 3) is predicated upon the Automobile Dealer Franchise Act, 15 U.S.C. § 1221 et seq. At a supplementary pretrial conference held on February 11, 1963, attended by all counsel and the Court, it was decided to submit for determination, prior to trial, the issue of whether or not plaintiff is entitled to rely upon the cited statutory sections; the critical question being the existence *vel non* of a "franchise" as defined by the terms of the Act.

Plaintiff, Reliable Volkswagen Sales & Service Company, Inc. (hereinafter Reliable) is a corporation of the State of Connecticut, with its principal place of business in the City of Bridgeport. It is engaged in the retail sales of various types of motor vehicles, and parts thereof, of foreign manufacture. Plaintiff was incorporated on January 24, *1956*, the date of filing of the certificate of incorporation, for the purpose of engaging "in the manufacture, sale and distribution of automobiles, motor cars, motor trucks and other mechanically propelled vehicles * * * more particularly that automobile known as VOLKS-WAGEN," and "to engage in the repair and servicing of automobiles, motor cars, motor trucks and other mechanically propelled vehicles and more particularly the repair and servicing of that certain automobile known as VOLKS-WAGEN." On May 16, 1956, the Connecticut Department of Motor Vehicles approved a license for the sale of Volkswagens by one of plaintiff's officers, Lawrence Oliver, d/b/a Reliable Volkswagen Sales Inc. A letter dated January 13, 1956, from World-Wide Automobile Corp. certifying Reliable *Motor Sales Incorporated* as a dealer was submitted to the Dealers and Repairers Section (presumably of the Connecticut De-partment of Motor Vehicles).[1] The letter referred to concluded with: "This letter of authorization in no way constitutes a franchise agreement between the above-named dealer and World-Wide Automobiles Corporation."

The defendant Volkswagenwerk G.m. b.H. (hereinafter VW), is a corporation of the German Federal Republic, engaged in the manufacture of Volkswagen automobiles and parts for the same, at Wolfsburg, West Germany. VW originally imported its products into the United States of America for sale therein; but later effected such importation through a subsidiary, which it caused to be organized under the laws of the State of New York, known as Volkswagen United States, Inc. (hereinafter VUS). More recently, VW caused to be organized, under the laws of the State of New Jersey, another subsidiary corporation known as Volkswagen of America, Inc. (hereinafter VOA), having a principal place of business at Englewood Cliffs, New Jersey, which the complaint alleges, supervised the distribution of Volkswagen automobiles and parts in the United States, in behalf of VW. Volkswagen automobiles and parts for the same are sold in commerce between West Germany and the United States of America, and among the several States of the latter.

The defendant World-Wide Automobile Corp. (hereinafter W-W), a New York State corporation, with a place of business in Long Island City, handles the distribution, within the States of New York, New Jersey and Connecticut, of Volkswagen vehicles and parts manufactured by VW and imported and sold by and through VOA and VUS.

The defendants Fifth Avenue Motors, Inc. and Queensboro Motors Corp., both New York corporations, are retail dealers handling VW products in Manhattan and Long Island City, New York, and

1. The name Reliable Motor Sales Inc. was adopted on December 7, 1948; the corporation having originally been incorporated in 1936 under another name. This corporation had its existence terminated by operation of law on June 26, 1951, but nevertheless filed for and received a license under that corporate name for the sale of new and used English cars, in 1954.

they obtain their merchandise through W-W.

The individual defendants, Dillon and Stanton, are officers and directors of W-W, Fifth Avenue and Queensboro.

Count 3 of the complaint alleges that in or about April 1954 "plaintiff and defendant *World-Wide* entered into an agreement whereby plaintiff was designated as the duly authorized retail dealer in the City of Bridgeport, State of Connecticut, of Volkswagen automobiles, trucks, accessories and parts, to be supplied and furnished to plaintiff by defendant *World-Wide*." (Emphasis supplied.) The third count further recites that plaintiff received vehicles from defendants from January 1, 1955 to January 1, 1957, and that on or about January 1st, 1956 the defendants agreed to sell to plaintiff a minimum of 30 Volkswagenwerk manufactured products per month on the condition that plaintiff enlarge, expand and rebuild his show-room and allied facilities. Plaintiff charges that by reason of the foregoing it was an automobile dealer within the terms of the Act and that the "agreement of franchise" heretofore alleged "purported to and did fix the legal rights and liabilities of the respective parties thereto in regard to the distribution, sale and servicing of motor vehicles and parts  *  *." Finally, this cause of action states that defendants, acting in an unfair manner, cancelled and refused to carry out the contracts and agreement pursuant to which defendants had appointed and constituted plaintiff an authorized dealer, by reason of which plaintiff suffered damage.

The narrow question here presented to the Court by stipulation of all of the parties, is whether or not a "franchise" existed within the definition set forth in the Act; it being agreed that, if none is found, the third cause of action must fall.[2] The statute, 15 U.S.C. § 1221, it-self defines the word as follows: "(b) The term 'franchise' shall mean the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract."

■ If a definition of a word used is given in a statute the statutory definition is controlling. Otherwise the word will be given its common ordinary meaning. Von Weise v. Commissioner, etc., 8 Cir., 1934, 69 F.2d 439, cert. den. 292 U.S. 655, 54 S.Ct. 866, 78 L.Ed. 1504; Western Union Telegraph Co. v. Lenroot, 1944, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414; National Labor Relations Board v. Coca-Cola Bottling Co., 1956, 350 U.S. 264, 76 S.Ct. 383, 100 L.Ed. 285; Addison v. Holly Hill Co., 1944, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488.

It is conceded by plaintiff that it never entered into a franchise agreement of a formal nature, similar to those generally in use in the automobile industry in this country. In describing such an agreement, Professor Kessler states in Automobile Dealer Franchises: Vertical Integration by Contract, 66 Yale Law Journal 1135, 1138/9, 1957, "The franchise is embodied in a detailed, standardized contract presented by the manufacturer to the dealer. The master contract is frequently accompanied by printed addenda concerning such matters as capital requirements and succession. Modern franchise contracts show great similarity; the absence of complete uniformity may be ascribed to the competition for dealers among the five remaining manufacturers. This high degree of standardization is best illustrated by the 'entire agreement' clauses."

Plaintiff contends, however, that the Act does not limit the relief which it affords to one who has entered into such

---

2. In his opinion, filed February 24, 1960, Circuit Judge Forman, sitting as a Judge of this Court, denied defendants' motion to dismiss and for summary judgment upon this third cause of action, (D.C., 182 F.Supp. 412), because he recognized the presence of a "fact question * * * i. e., was there a franchise agreement or contract in existence between the plaintiff and the defendants herein?"

a formal agreement, but additionally protects one in its position, that is, one who has acted as a dealer, and is considered as such by the manufacturer notwithstanding the absence of a franchise agreement such as that described supra. Recognizing the necessity of meeting the statutory requirement in order to sustain its third cause of action, plaintiff claims the benefit of a purported integrated contract, which it asserts satisfies that requirement. In support of its position, and as evidence of its integrated contract, plaintiff has submitted 292 documents to the Court.

In determining whether a franchise existed, Reliable poses two questions for the Court's determination, viz.: "(1) Is the 'written agreement or contract' contemplated by the statute restricted solely to a single, formal writing, or may the series of writings, read together, satisfy the statutory requirement? and (2), Do the writings submitted by plaintiff, when read together, 'fix the legal rights and liabilities of the parties'?" A further question suggests itself to the Court, i. e. whether defendant W-W is an automobile manufacturer as defined in the Act. 15 U.S.C. § 1221(a) defines "automobile manufacturer" as any corporation "engaged in the manufacturing or assembling of passenger cars, trucks, or station wagons, including any * * * corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." By the express terms of the exclusive distribution agreement between VW and W-W, the latter transacts all business resulting from the distribution in its own name and for its own account; and it is *not authorized* to legally represent VW, or make any commitments on behalf of VW. From this it appears that W-W might well be held to be outside of the statutory definition of "automobile manufacturer." Because, however, this point has not been briefed by counsel, and against the possibility that there may be other facts in the case not pres-

ently disclosed to the Court, I do not decide this question; decision thereon not being essential to the determination of the question now before the Court.

■ Section 1(e) of the original Bill which passed the Senate in 1956 [S. 3879, 84th Cong. 2d Sess. (1956)] defined a "franchise" as including any "understanding or arrangement between any automobile manufacturer and any automobile dealer." It may well be that under this broad language plaintiff would be able to spell out such an arrangement. Certainly the documents submitted establish, as mentioned above, that the plaintiff was a dealer in Volkswagen automobiles and parts for a certain period of time. Were this a common law action, the plaintiff might be able to establish, by proper evidence, either a contract or an estoppel to deny a contract upon which it could rely. However, we are here dealing with a statutory cause of action, and as such the plaintiff must show compliance with the prerequisites to the maintenance thereof, established therein. A *sine qua non* to recovery is proof of a *written* contract which "purports to fix the legal rights and liabilities of the parties * * *." The broader language referred to and included in the original Senate Bill was subsequently deleted from the legislation as enacted.

Section 1 of the Restatement of Contracts defines a contract as "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Section 3 of the same Restatement defines "agreement" as having a broader meaning than "contract." It states: "An agreement is a manifestation of mutual assent by two or more persons to one another."

In employing the phrase "agreement or contract" the Congress must either have intended to treat the two nouns as synonymous or antonymous. Whether considered as synonymous or as differing entities, the statutory definition requires

that the legal rights and liabilities of the parties be fixed thereby.

In Helvering v. Northwest Steel Rolling Mills, 1940, 311 U.S. 46, 49, 61 S.Ct. 109, 111, 85 L.Ed. 29, the Supreme Court said: "The natural impression conveyed by the words 'written contract executed by the corporation' is that an explicit understanding has been reached, reduced to writing, signed and delivered." Cf. Sommer v. Nakdimen, 8 Cir., 1938, 97 F.2d 715, cited by plaintiff, where the Court expressed its recognition that "a written contract may be spelled out by reading together two or more separate writings." The Court in Sommer went on to qualify this statement by saying "when read together they must disclose the contract declared upon." See also H. Herfurth Jr., Inc. v. United States to Use of Squire, 1936, 66 App.D.C. 220, 85 F.2d 719. Corbin, in discussing the problem, states: "There must be found a final closing of the deal, each party indicating by an overt expression that the process of negotiation is complete and that he now assents to all the terms already tentatively adopted. The correspondence must show what those terms are; and the fact that they were so adopted by both parties must be established." 1 Corbin on Contracts § 31 (1960 Ed.).

Plaintiff's argument based upon the claimed analogy of the principles of law relevant to the Statute of Frauds is inapposite to the question presently confronting us. The statutory requirement that the agreement between the parties be embodied in a writing in the present case is the definition in the Act under which, if at all, plaintiff derives this cause of action. We are not here concerned with the Statute of Frauds, whether it be that of New York, New Jersey or Connecticut, in seeking to ascertain whether a written franchise agreement existed between the parties.

"A written memorandum of a contract is not identical with a written contract. A written contract will indeed serve as a memorandum, but a memorandum includes also any writing which states the terms agreed upon, though not intended or adopted by the parties as a final complete statement of their agreement." Restatement of the Law of Contracts, § 207, comment (a).

"Integrated contracts must be distinguished from written memoranda by which contracts may be proved, and from contracts formed by letters or other informal writings the words of which have not been assented to by both parties as a definite and complete expression of their agreement." Id. § 228, comment (a).

Assuming (but not deciding) that by "written agreement or contract" the Congress envisioned the term as encompassing an integrated written contract, is proof thereof established by the documents submitted? Can it be said that W-W and Reliable assented that these writings should establish a contract? The answer is clearly negative. The proof before me is devoid of any evidence of such assent; nor can these 292 documents conceivably be deemed to spell out an agreement which purports to fix the rights and liabilities of the parties. The standard VW franchise contract is properly before the Court, having been submitted by defendants for purposes of this decision.[3] Contained

---

3. The text of this "Dealer Agreement" is as follows:

AGREEMENT made at ——— on the ——— day of 19—, by and between ———, a corporation having its principal place of business at ——— (hereinafter referred to as the "Distributor"), and ———,* having its place of business at ——— (hereinafter referred to as the "Dealer").

* If Dealer is not an individual, state whether it is a partnership, or a corporation and in the latter case, indicate the state of incorporation. If Dealer is an individual doing business under an assumed name, indicate both his individual and his assumed name.

## ARTICLE 1
### Definitions

(1) Volkswagenwerk G.m.b.H., a German corporation, is hereinafter referred to as "VW".

(2) Volkswagen of America, Inc., a New Jersey corporation, is hereinafter referred to as the "Exclusive Importer."

(3) As used in this Agreement, the term "VW Products" refers to VW automotive vehicles of any model and type as well as spare parts pertaining thereto. The term "VW Products" includes parts manufactured by VW itself as well as parts purchased by VW from other suppliers and installed or supplied as spare parts by VW.

## ARTICLE 2
### Appointment

(1) Distributor appoints ———— (insert name of Dealer as stated in preamble above.) as a dealer for VW Products.

(2) Dealer may not sell any VW Products into areas outside of the United States and the territories of Alaska and Hawaii, except in accordance with the Home and European Delivery Plan pursuant to directives therefor issued by Exclusive Importer as from time to time amended.

## ARTICLE 3
### Task and Legal Position of Dealer

(1) Subject to the terms and conditions of this Agreement, Distributor will sell and deliver VW Products to Dealer for resale. Dealer undertakes the sale of VW Products as well as the customer's service for VW Products.

(2) Dealer will transact all business pursuant to this Agreement on its own behalf and for its own account; it has no power or authority whatsoever to act as agent or otherwise for or on account of or on behalf of VW or of Exclusive Importer or of Distributor. Dealer agrees to refrain from any attempt to assume or create obligations for, or to act in any other manner as agent or on account or on behalf of, VW or Exclusive Importer or Distributor.

(3) In the conduct of its business, Dealer will safeguard and in every possible way promote the interests of VW, Exclusive Importer and Distributor and the favorable reputation of VW Products; it will refrain from all conduct which might be harmful to the good will of VW or of Exclusive Importer or of Distributor or to the reputation of VW Products or inconsistent with the public interest. Dealer will arrange for efficient promotion of VW Products; and in such promotion, as well as in its activities relating to the sale of VW Products, the customer's service for VW Products and the supply of VW spare parts, it will give due consideration to all reasonable directives and suggestions of Distributor relating thereto.

## ARTICLE 4
### Orders

(1) Dealer shall furnish its orders for VW Products to Distributor on forms supplied by Distributor at such time or times as Distributor may from time to time reasonably require, and all such orders may be accepted by Distributor in whole or as to any part thereof by notice in writing to Dealer or by delivery of the VW Products ordered in accordance therewith. Except as otherwise expressly hereinafter provided, such orders shall be and remain binding upon Dealer until they are rejected in writing by Distributor. Distributor shall give due consideration to such orders; but such orders shall not be binding upon Distributor except to the extent that they shall have been actually accepted either by notice in writing to Dealer or by delivery as aforesaid.

(2) To the extent that such orders shall not have been accepted as aforesaid, Distributor shall accordingly not be liable in any way for failure to deliver or for delay in making delivery, and even to the extent that such orders shall have been accepted as aforesaid, Distributor shall not be under any liability whatsoever toward Dealer for failure to deliver under or for delay in making delivery if such failure or delay is due to the fact that delivery or timely delivery was rendered impossible or more burdensome than it would have been in the normal course of business by any event, whether foreseen or foreseeable or not, brought about by causes other than wilful or grossly negligent conduct of Distributor, such as, for instance, any event in the nature of *force majeure*, acts of God, acts of Princes, foreign or civil wars, riots, interruption of navigation, shipwrecks, strikes, lockouts, other labor troubles, embargoes, blockades, fires, failures of Exclusive Importer or of any other supplier of Distributor to deliver or delay of Exclusive Importer or of any other supplier of Distributor in making delivery, the foregoing specific events having been listed herein only by way of illustration and not by way of limitation.

(3) The VW Products sold shall be at Dealer's risk and peril from their delivery to Dealer, Dealer's agent or carrier at the place of delivery specified in Distributor's established terms of delivery and during all subsequent transporta-

tion; and it shall be up to Dealer to insure such risks for its benefit and at its expense.

(4) All claims for alleged incomplete delivery of VW Products must be made in writing immediately upon receipt of the shipment.

(5) In the event that Dealer shall fail or refuse for any reason whatsoever to accept delivery of any VW Products ordered by Dealer, Dealer shall pay Distributor the amount of all expenses incurred by Distributor in shipping such VW Products to Dealer and in returning them to the original point of delivery or in directing them to another destination, as the case may be; but in no event shall Dealer pay Distributor in connection with any such diversion an amount in excess of the expense of returning such VW Products to their original point of delivery. The liabilities of Dealer pursuant to this paragraph shall be in addition to, and not in lieu of, such other liabilities as may arise from Dealer's failure or refusal to accept delivery.

## ARTICLE 5
### Dealer's Sales Facilities

(1) Dealer shall maintain for its VW business under its own corporate or business name a salesroom located at ——— and a repair shop located at ———, both installed and equipped in a manner reasonably satisfactory to Distributor, and shall not change the location of its said salesroom or repair shop, nor establish any additional salesroom or repair shop without the prior written consent of Distributor.

(2) At and around its premises Dealer shall conspicuously display a sufficient number of VW signs in accordance with the directives of Distributor, and Dealer shall use for its VW business only stationery and business forms in accordance with the directives of Distributor and print such stationery and business forms as to the VW sign, the word "Volkswagen" and all pictorial representation of VW automotive vehicles appearing thereon only from matrices supplied by Distributor.

(3) Dealer will employ for its business a sufficient number of competent salesmen.

## ARTICLE 6
### Customer's Service

(1) Dealer will give superior customer's service to all owners of VW automotive vehicles who may request such service from Dealer. Dealer will employ in accordance with the volume of its business such number of competent mechanics in its repair shop as may be required to assure prompt and satisfactory customer's service for all such owners, such mechanics to be selected by Dealer from personnel trained by VW or within the VW organization and recommended by Distributor, as long as Dealer's own technical personnel shall not have had the requisite instruction and training.

(2) Dealer will see to it that its technical personnel will be thoroughly trained in special VW courses and thereafter currently and thoroughly instructed about all new suggestions of VW for the servicing and repair of VW Products.

(3) In the installation and operation of Dealer's repair shop, due consideration shall be given to the directives and suggestions which may from time to time be issued by Distributor, particularly, but not by way of limitation, with respect to:

(a) Sufficient size and satisfactory installation of repair, storage and office space in proportion to the number of VW automobiles circulating in the area to be serviced;

(b) Sufficient advertising of the location of the repair shop through VW customer's service signs prescribed by Distributor;

(c) Procurement and maintenance of the requisite general tools, special VW tools and special VW equipment, as well as of at least one complete set of VW customer's service literature per repair shop;

(d) Employment of qualified and efficient personnel and its training in special VW courses;

(e) Correct execution of all service and repair work with respect to VW Products; and

(f) Quick service for VW customers.

(4) With each delivery to a purchaser of a VW Product for which a Customer's Service Booklet is issued, Dealer will deliver such Customer's Service Booklet to the purchaser after having affixed thereto a stamp with its corporate or business name. Upon presentation of a coupon from a Customer's Service Booklet, Dealer will promptly and efficiently perform the services required by such coupon, irrespective of whether the VW Product to be serviced was delivered to the purchaser by Dealer itself, another VW dealer, or a VW distributor.

(5) In accordance with the directives of Exclusive Importer, the first three maintenance inspections following the delivery of a new VW automotive vehicle are free of any charge to the customer.

Dealer will absorb the cost of these maintenance inspections without any claim to reimbursement, if it delivered the automotive vehicle itself to the purchaser. In the event that one or more of these free maintenance inspections are performed by a VW distributor or a VW dealer other than Dealer with respect to an automotive vehicle delivered to the purchaser by Dealer, Dealer will pay to such VW distributor or to such other VW dealer the amount of the charge for such maintenance inspection in accordance with the rate therefor then currently recommended by Exclusive Importer. Conversely, in the event that Dealer performs one or more of these free maintenance inspections with respect to an automotive vehicle delivered to the purchaser by a VW distributor or another VW dealer, Dealer shall be entitled to receive from such VW distributor or such other VW dealer the amount of such charge.

(6) All claims of Dealer for payment of such charges against a VW distributor or a VW dealer shall be processed through Distributor.

### ARTICLE 7
#### Dealer's Stock

Dealer agrees to acquire and at all times maintain at least the minimum inventory determined in Schedule A, annexed hereto, of VW Products which are supplied to it by Distributor and of spare parts, procurement of which from other sources shall have been expressly approved by VW or Exclusive Importer, subject only to the ability of Distributor and of such other sources to supply the products ordered by Dealer. Dealer further agrees to have available at all times for purposes of demonstration the number of VW automotive vehicles of the most recent types and models determined in Schedule A, annexed hereto, and to keep the same at all times in first-class operating condition. Dealer undertakes to increase the number of the VW automotive vehicles held by it for purposes of demonstration as well as the volume of its minimum inventory of VW Products and of such other spare parts from time to time in accordance with the volume of its business as reasonably requested by Distributor in order to further its sales activities and to assure satisfactory customer's service for owners of VW automotive vehicles.

### ARTICLE 8
#### Spare Parts Supply

(1) Dealer will not sell or offer for sale or use in the repair or servicing of any VW automotive vehicle, as genuine new VW spare parts or as spare parts approved by VW or by Exclusive Importer, any spare parts which are not in fact genuine new VW spare parts or spare parts expressly approved by VW or by Exclusive Importer.

(2) Dealer hereby acknowledges that it is aware of the policy of VW according to which VW dealers should not use in the repair or servicing of VW automotive vehicles and should not sell or offer to sell to others for such use any spare parts other than genuine VW Products or spare parts expressly approved by VW or Exclusive Importer if such spare parts are (a) necessary to the mechanical operation of such automotive vehicle and (b) not equivalent in quality and design to genuine VW spare parts or spare parts expressly approved by VW or by Exclusive Importer.

### ARTICLE 9
#### Changes with Respect to VW Products

VW Products will be delivered in accordance with standards applicable at the time of their shipment from the factory. In the event of any change or modification with respect to any VW Products, Dealer shall not be entitled to have such change or modification made with respect to any VW Products which shall have been shipped from the factory prior to the introduction thereof. Distributor may request that Dealer make such changes or refrain from making such changes of VW Products as may from time to time be prescribed by Exclusive Importer, and Dealer agrees to comply with such requests.

### ARTICLE 10
#### Distributor's Sales Prices

Distributor shall sell VW Products to Dealer at such prices and upon such terms as may from time to time be established by Distributor for its sales to dealers in the area in which Dealer is located. Dealer shall also pay any and all sales taxes, excise taxes and other governmental or municipal charges imposed or levied or based upon the sale of VW Products by Distributor to Dealer. In the event of any increase of the prices established by Distributor for the area in which Dealer is located, Dealer shall have the right to cancell all orders for VW Products affected by the increase and pending any unfilled at the time Dealer obtains notice of the increase, provided that Distributor be notified in writing of such cancellation within ten days from the time Dealer obtains such notice.

## ARTICLE 11
### Distributor's Terms of Payment
#### and Delivery

(1) Except where the invoice may show a sale on credit, payment in actual cash or by delivery of approved check shall be made by Dealer at the time and upon the conditions specified in Distributor's established terms of payment, and in any event before delivery of the VW Products sold to Dealer, Dealer's agent or carrier at the place of delivery specified in Distributor's established terms of delivery.

(2) Dealer shall pay all collection charges and costs of exchange, if any, incurred in connection with its payments. Delivery of any checks or instruments of payment other than actual cash shall not constitute payment until Distributor shall have collected actual cash in the full amount thereof.

(3) Except where the invoice may show a sale on credit, title to the VW Products sold shall remain with Distributor and Distributor shall have the right to retake and resell the VW Products sold until Distributor shall have collected actual cash in the full amount of the purchase price therefor.

## ARTICLE 12
### Resale Prices of Dealer

Dealer will post at a conspicuous place in Dealer's salesroom a retail delivered price schedule of all models and types of VW automotive vehicles and of all available optional equipment therefor.

## ARTICLE 13
### Down Payment and Trade-Ins

Dealer agrees: that it will hold in trust all payments, whether in money or in kind, by transfer of used automobiles or otherwise, which it may receive on account of orders for subsequent delivery of VW Products; that it will keep all such monies as a trust fund in an account separate and distinct from Dealer's general funds; that it will not sell nor place any lien on any such property without at the same time depositing into the said separate and distinct account an amount equal to the trade-in allowance agreed upon with the customer for such property; that all of the said monies or property shall be so held in trust until consummation of the transaction with respect to which it was received; and that Dealer's purchase order forms signed by its customers at or before the time of receipt of such monies or property will contain provisions requiring Dealer to hold the same in trust in the manner specified in this Article 13.

## ARTICLE 14
### Warranty and Warranty Claims

(1) Each VW Product to be sold by Distributor to Dealer pursuant to this Agreement will be warranted by VW in accordance with the "Terms of Warranty for New VW Automobiles and Genuine VW Spare Parts" which in their present form are annexed hereto as Schedule B, as the same may from time to time be amended by VW. In view of the said warranty by VW, Distributor itself does not undertake any responsibility whatsoever for the quality and condition of VW Products except with respect to defects caused by negligent handling on the part of Distributor.

(2) Dealer undertakes that all its sales of VW Products shall be made in such a way that the purchaser shall acquire all rights in accordance with the said Terms of Warranty for New VW Automobiles and Genuine VW Spare Parts, as the same may from time to time be amended by VW, to the exclusion of any other, further or different warranties, and that the text of the said Terms of Warranty for New VW Automobiles and Genuine VW Spare Parts, as the same may be from time to time amended by VW, shall be reprinted in full on all forms of purchase orders and invoices used in connection with such sales in such a way that the operative text of such purchase orders and invoices incorporates the said Terms of Warranty for New VW Automobiles and Genuine VW Spare Parts by express reference thereto.

(3) The procedure for the processing and disposition of warranty claims and for the return and disposition of parts claimed to be defective shall be as from time to time established by Exclusive Importer. Dealer shall comply with all suggestions of Distributor for the performance of services pursuant to warranty claims.

## ARTICLE 15
### Access to Dealer's Premises
#### and Reports and Statements

Until the expiration or prior termination of this Agreement and thereafter until consummation of all the transactions referred to in Article 21 hereof, Distributor, through its employees and others designees, shall have the right at all reasonable times during regular business hours to inspect Dealer's business premises as well as Dealer's records and accounts relating to the purchase, sale and servicing of VW Products. Dealer shall furnish to Distributor such reports and financial statements as Distributor

may from time to time reasonably require.

## ARTICLE 16
### Trade Marks and Trade Names

Dealer agrees to use the word "Volkswagen," the abbreviation "VW" and any other trade mark or trade name now or at any time hereafter used or claimed by VW exclusively in connection with the sale and servicing of VW Products. Dealer will not use as part of its corporate or business name the word "Volkswagen," the abbreviation "VW" or any other trade mark or trade name now or at any time hereafter used or claimed by VW, unless it shall have obtained express prior written permission from Exclusive Importer to do so; as a rule, such permission will not be granted.

## ARTICLE 17
### Disclaimer of Distributor's Liability

Except as expressly herein provided, Distributor shall not be under any liability whatsoever for any expenditure made or incurred by Dealer in connection with the performance of Dealer's obligations under this Agreement.

## ARTICLE 18
### Dealer's Ownership

(1) This Agreement has been entered into by Distributor in reliance upon the representations that the following individuals, and no other persons, are the beneficial owners of Dealer in the following proportions:

| Name | Address | Percentage of Beneficial Interest |
|---|---|---|
| (Space provided) | | |

and that the following individuals, occupying the following positions, and no other persons, have power and responsibility in the management of Dealer:

| Name | Address | Title of Office |
|---|---|---|
| (Space provided) | | |

(2) Dealer agrees that there shall be no voluntary change in such beneficial ownership or management power or responsibility without prior written consent of Distributor.

## ARTICLE 19
### Terms of Agreement

This Agreement is made for a period beginning with the date of its delivery or mailing by Distributor to Dealer, and expiring December 31, 19—.

## ARTICLE 20
### Prior Termination

A. Distributor shall have the right at any time to forthwith bring about the prior termination of this Agreement for cause by sending notice of such termination to Dealer by registered mail or telegraph. The following events shall be considered sufficient cause; but they are enumerated in this Agreement only by way of illustration and not by way of limitation:

(a) Death of Dealer, if an individual, or of a partner in Dealer, if a partnership, or dissolution or liquidation of Dealer, if a partnership or corporation;

Insolvency of Dealer or the filing of a petition in bankruptcy or under any state insolvency law by or against Dealer, or the appointment of a receiver or other officer having similar powers for Dealer or Dealer's business; or any levy under attachment, execution or similar process upon any property of Dealer, which is not forthwith removed by payment or bonding or vacated;

Or failure by Dealer to obtain, or the suspension or revocation of, any license necessary for the conduct by Dealer of its business in accordance with this Agreement;

(b) Any transfer or attempted transfer of this Agreement or any part thereof or interest therein by Dealer without the prior written consent of Distributor;

Or any change, whether voluntary or by operation of law, in the beneficial ownership or the management of Dealer, as stated in Article 18 hereof without the prior written consent of Distributor; or any disagreement or personal difficulties between or among partners or stockholders of Dealer, or in the management of Dealer, which in Distributor's opinion may adversely affect the conduct of Dealer's business;

(c) Impairment of the reputation or financial standing of Dealer or of partners, stockholders or officers of Dealer subsequent to the execution of this Agreement, or ascertainment by Distributor of any facts having existed at or prior to the time of execution of this Agreement which tend to impair such reputation or financial standing;

(d) Any substantial breach or violation of, or default under, obligations incurred by Dealer under this Agreement or in connection with any transaction between the parties contemplated herein;

(e) Any other state of facts affecting Dealer which, in the opinion of Distributor, would tend to be harmful to the good will of VW or of Exclusive Importer or of Distributor, to the reputation and standing of VW Products, to the marketing of VW Products or to the performance of the required customer's service for owners of VW Products; and

(f) Termination of Distributor's franchise as a distributor of VW Products.

B. Dealer shall have the right at any time to bring about the prior termination of this Agreement without cause by sending notice of such termination to Distributor by registered mail or telegraph sixty days in advance of the effective date thereof.

## ARTICLE 21
### Rights and Liabilities Upon Expiration or Prior Termination

A. Upon the expiration or prior termination of this Agreement under any provision of this Agreement other than Article 20, paragraph (f), Dealer shall forthwith:

(a) Remove at its own expense all VW signs from its place of business, and sell and deliver the same to Distributor in suitable condition and packing for transportation at Dealer's place of business against payment or tender of such price therefor as shall be reasonably determined by Distributor, provided, however, that such price shall in no event be less than Dealer's original cost price for such signs reduced by straight line depreciation on the basis of a useful life of five years;

(b) Discontinue the use of all stationery and other printed material referring in any way to VW or bearing any trade mark or trade name then owned or claimed by VW, cease to hold itself out as an authorized VW Dealer and, if its corporate, firm or business name contains the word "Volkswagen" or the abbreviation "VW," or any other trade mark or trade name then owned or claimed by VW, take all steps to remove such word or abbreviation or trade mark or trade name therefrom;

(c) Transfer to Distributor or Distributor's designee or designees all purchase orders for VW Products from customers then pending with Dealer and turn over to it, him or them all deposits made thereon, whether in cash or in kind;

(d) Communicate to Distributor in writing the names and addresses of all of its VW service customers; and

(e) Return to Distributor at Distributor's place of business, free of all charges, any and all technical or service literature, advertising and other printed material relating to VW Products then in Dealer's possession and which was acquired or obtained by Dealer from Distributor.

With the sole exception of Distributor's obligation to pay the price for all VW signs sold and delivered to it by Dealer as aforesaid, all of the foregoing shall not result in any liability of Distributor to Dealer for damages, commissions, loss of profits or compensation for services, nor in any other liability of Distributor to Dealer of any kind or nature whatsoever.

B. Upon the expiration or prior termination of this Agreement under any provision of this Agreement other than Article 20, paragraph (f), Distributor shall have the right to cancel all pending orders of Dealer for VW Products previously accepted by Distributor, and Distributor agrees to purchase from Dealer and to pay for all of the following, and Dealer agrees to sell and deliver the same to Distributor:

(i) All new, unused and undamaged VW automotive vehicles then unsold in Dealer's inventory which are in first-class saleable condition and of then current model and type, provided they were purchased by Dealer from Distributor. The price for such automotive vehicles shall be the same at which they were originally purchased by Dealer from Distributor or the price then last established by Distributor for the sale of identical automotive vehicles by Distributor to dealers in the area in which Dealer is located, whichever shall be lower, in either case less all prior refunds or allowances made by Distributor with respect thereto, if any;

(ii) All new, unused and undamaged VW spare parts then unsold in Dealer's inventory which are in first-class saleable condition, provided that they were purchased by Dealer from Distributor, and all new, unused and undamaged spare parts expressly approved by VW or by Exclusive Importer then unsold in Dealer's inventory which are in first-class saleable condition. The price for such spare parts shall be the price then last established by Distributor, and, with respect to spare parts from sources other than Distributor, by the supplier thereof, for the sale of identical spare parts to dealers in the area in which Dealer is located; and

(iii) All tools and equipment specially designed for servicing VW Products and then owned by Dealer, provided they were purchased by Dealer from Distributor or pursuant to requests of Distributor. The price for such tools and equipment shall be reasonably determined by Distributor, provided, however, that such price shall in no event be less than Dealer's original cost price for such tools and equipment reduced by straight line depreciation on the basis of a useful life of five years.

Any and all items to be sold by Dealer to Distributor pursuant to this para-

graph B of this Article 21 shall be delivered by Dealer to Distributor at Dealer's place of business in suitable condition and packing for transportation against payment or tender of the price therefor.

### ARTICLE 22
### General Provisions

A. Dealer acknowledges that only the President or a Vice-President of Distributor is authorized on behalf of Distributor to execute this Agreement or to agree to any variation, modification or amendment of any of its provisions or to sign any notice of prior termination with respect thereto.

B. This instrument contains the entire agreement between the parties. No representations or statements other than those expressly herein set forth were made or relied upon in entering into this Agreement.

C. This Agreement terminates and supersedes all prior agreements with respect to VW Products between the parties, if any. The parties hereby waive, abandon and relinquish any and all claims of any kind and nature whatsoever arising from or out of or in connection with any such prior agreement, provided, however, that nothing herein contained shall be deemed a waiver of any claims arising out of prior sales of VW Products by Distributor to Dealer.

D. This Agreement may not be varied, modified or amended except by an instrument in writing duly signed by the parties.

E. This Agreement, or any part thereof or interest therein, may not be transferred by Dealer without the prior written consent of Distributor.

F. Any notices under or pursuant to the provisions of this Agreement may be directed to the respective addresses of the parties hereinabove stated, or, if either of the parties shall have specified another address by notice in writing to the other party, to the address thus last specified. The parties undertake to forthwith advise each other in writing of any change of address.

G. The waiver by either party hereto of any breach or violation of, or default under, any provision of this Agreement shall not be a waiver of such provision or of any subsequent breach or violation thereof or default thereunder.

H. If any provision of this Agreement should be held invalid or unenforceable for any reason whatsoever or to violate any law of the United States, the District of Columbia, or any state, this Agreement shall be considered as divisible as to such provision, and such provision shall be deemed deleted from this Agreement or, in the event that it should be held to violate only the laws of the District of Columbia or of any state, to be inapplicable within the territory thereof, and the remainder of this Agreement shall be valid and binding as if such provision were not included herein or as if it were included herein only with respect to territories outside of such District or state, as the case may be.

I. The titles appearing at the beginning of the various articles of this Agreement have been inserted for convenient reference only and shall not in any way affect the construction, interpretation and meaning of the text of the said provisions themselves.

J. For all disputes or controversies which may arise between them out of, or in connection with, this Agreement, its construction, interpretation, effect, performance or non-performance or the consequences thereof, as well as out of, or in connection with, any transaction between them contemplated herein, or the construction, interpretation, effect, performance or non-performance thereof or the consequences of any of the foregoing, the parties hereby consent to the jurisdiction of the courts of ———— ———— and of the Federal court sitting in ———— ————, and Dealer agrees that any and all process directed to it in any such litigation may be served upon it outside of ———— with the same force and effect, as if such service had been made within ————; and the parties hereby waive the right to trial by jury in any such litigation.

By: ————————————
(Title)

By: ————————————
(Title)

### SCHEDULE A
Minimum Number of VW Automotive Vehicles for Purposes of Demonstration

(Space provided)

Minimum Inventory of Spare Parts

Volume necessary to satisfy at any given time the requirements of Dealer's business for a period of three months.

### SCHEDULE B
Terms of Warranty for New VW Automobiles and Genuine VW Spare Parts

This warranty applies to automobiles, including passenger cars and transporters, as well as spare parts for such automobiles, manufactured or supplied by Volkswagenwerk G.m.b.H. (hereinafter

therein are many obligations undertaken by one party with concomitant rights in favor of the other. None of the obligations so disclosed or rights so established is revealed in the exhibits submitted by plaintiff to the Court. I recognize that to be a franchise no specific obligation need be in any particular contract or agreement; but from the documents submitted *NO* such rights or liabilities are established.

Reliable has endeavored to assist the Court by classifying the 292 documentary exhibits upon which it bases its contention that a franchise existed between it and the defendant under the following 13 categories, viz.:

(1) Correspondence from World-Wide to Reliable *Motor Sales Inc.* (Exhibits 1–59 incl.);

(2) Correspondence from World-Wide to Reliable Volkswagen Sales & Service Co., Inc., (Exhibits 60–77 incl.);

(3) Telegrams from World-Wide to Reliable concerning delivery of vehicles (Exhibits 78–93 incl.);

(4) Written notices from World-Wide to Reliable relating to al-

referred to as "VW"), all of which are herein referred to as "VW Products".

(1) Warranty claims can be made only through a VW dealer or authorized VW repair shop. They must be made forthwith upon ascertainment of the defects. The repairs must be performed in the repair shop of a VW dealer or in an authorized VW repair shop.

(2) VW warrants VW Products to be free of defects in material and workmanship according to current industrial standards. The warranty becomes effective at the time of delivery of the VW Product by the VW dealer, or the authorized VW repair shop, to the customer. The warranty expires six months thereafter or when the VW Product has been driven or used over a distance of six thousand miles, whichever event shall first occur. With respect to assemblies delivered together with VW Customer's Service Booklet, the warranty expires:

As to new assemblies: six months;
As to exchanged assemblies: three months;

In both cases from the time of installation, or when the assembly has been used over a distance of six thousand miles, whichever event shall first occur.

In any event the warranty expires twelve months after shipment of the VW Product from factory in Germany.

As to VW vehicles assembled outside of Germany, the warranty of VW is limited to CKD-supplies at the time of shipment from factory in Germany.

(3) The obligation under this warranty is limited, at the election of VW, to the replacement or repair of such parts as shall be acknowledged by VW to be defective in material or workmanship. At the request of VW, parts to be replaced must be exhibited or shipped from the office where the claim is made through the proper distributor or Exclusive Importer to VW or its designee. All parts which shall have been replaced shall be the property of VW.

No charge will be made to the customer with respect to the removal or installation of parts or with respect to freight incurred pursuant to this warranty.

(4) This warranty is expressly in lieu of all other warranties, obligations or liabilities of VW, whether for direct or consequential damage or otherwise.

(5) There shall be no right of rescission or to a reduction of the purchase price unless VW should not be in a position to cure the defect.

(6) The warranty is fully discharged:

(a) If the VW Product has been interfered with by unauthorized persons in any manner not approved by VW; or

(b) If parts have been installed the use of which has not been approved by VW;

And if in the sole judgment of VW the damage is causally related to the interference in case (a) or to the installation of unapproved parts in case (b).

The warranty will also be fully discharged if the customer has not complied with the instructions (Service Manual) of VW for the operation of the VW Product.

(7) Normal wear and tear is excepted from the warranty. The same applies to damage brought about by negligent or improper handling, including, but not by way of limitation, damage due to storage or corrosion.

location of vehicles (Exhibits 94–117 incl.);

(5) Lists of dealers issued by World-Wide (Exhibits 118–124 incl.);

(6) Letters from Reliable Motor Sales to World-Wide (Exhibits 125 and 126);

(7) Letters from Reliable Volkswagen Sales to World-Wide (Exhibits 127–168 incl.);

(8) Letters from World-Wide to customers of Reliable, referring to Reliable as World-Wide dealer (Exhibits 169–179 incl.);

(9) Notices "to all authorized Volkswagen dealers", concerning termination of dealerships, sent by World-Wide to Reliable (Exhibits 180–198 incl.);

(10) Circular letters addressed "to all authorized Volkswagen dealers", sent by World-Wide to Reliable (Exhibits 199–227 incl.);

(11) Circular letters, addressed "to all Volkswagen dealers" sent by World-Wide to Reliable (Exhibits 228–275 incl.);

(12) Circular letters, addressed "to all dealers", sent by World-Wide to Reliable (Exhibits 276–282 incl.);

(13) Miscellaneous written communications sent by World-Wide to Reliable (Exhibits 283–292 incl.).

The exhibits comprising the first category contain references to Reliable as an authorized Volkswagen dealer; invite Reliable to avail itself of the benefits of a factory service school; make inquiry respecting the warranty claims of customers of Reliable; require payment of an over-due merchandise account; make inquiry regarding the absence of orders from Reliable; particularize unsatisfactory items disclosed on inspection of Reliable's facilities; make inquiry respecting payment for inspections on vehicles sold by Reliable; offer aid in the planning and development of an addition to or modification of Reliable's facilities; confirm oral discussions between representatives of World-Wide and Reliable; urge Reliable to place its merchandise orders promptly; press Reliable for payments due on merchandise purchased; urge adherence to World-Wide's suggested policies for retaining customer good will; criticize inadequacy of Reliable's customer service; request submission of floor and plot plans of existing facilities for future planning and development; invite attendance of Reliable at an area dealer meeting; and other appropriate communications from the distributor to a retailer of a product in furtherance of their common interest in advancing sales, and obtaining and retaining customer good will.

█ Whether considered separately or in their totality, the documents in the first category fail to spell out a written agreement or contract which purports to fix the legal rights and liabilities of Reliable and World-Wide *inter sese*. From the correspondence reviewed, it may be inferred and implied that World-Wide was a distributor of Volkswagen products; that Reliable was an authorized dealer in those products; that World-Wide was the source from which Reliable obtained its merchandise; and that the relationship between the parties was that of wholesaler and retailer.

The last document embraced in the first category (No. 59), is the letter of September 27, 1957 to Reliable *Motor Sales, Inc.* from World-Wide Automobiles Corp., referring to a circular letter regarding amendments and supplements to Volkswagen Salesmen's Manual and requesting that the instruction sheet which was part thereof be signed by the user and returned, as requested previously.

The first document in the second category is numbered 60, being a letter dated October 4, 1956 from W-W to "Reliable Volkswagen" respecting a cus-

tomer's warranty complaint, and requesting comments thereon. The next communication in the second category is a form letter from W-W to Reliable Volkswagen Sales of October 5, 1956, returning a vehicle order form for completion. The remaining communications in the second category, from W-W, are addressed either to Reliable Volkswagen Sales, Inc., Reliable Volkswagen Sales & Service, Inc. or to Reliable Volkswagen, and are generally of a character similar to those embraced in the first category; i.e., they are normal routine business correspondence appropriate to a relationship of wholesaler and retailer existing between the parties, and to the merchandise in which they dealt.

The nature of categories 3 and 4 is described in the statement of each of these categories, i.e., telegrams from W-W to Reliable concerning the delivery of vehicles, and written notices from W-W to Reliable relating to the allocation of vehicles. Typical of category 3 is a telegraphic request to Reliable to pick up a Volkswagen automobile from a Brooklyn pier. Exhibit 95, in category 4, is a notice from W-W to Reliable containing a break-down of Reliable's quota of Volkswagen automobiles for the production month of October 1955; and number 117, the last of that category, is a similar notice for the production month of July, 1957.

Exhibits 118 through 124 (category 5) are dealer lists sent out by W-W to the various Volkswagen automobile dealers in its distribution territory from February 15, 1955 to April 1, 1957.

Under date of November 26, 1957 Reliable *Motor Sales* Inc. wrote to W-W respecting Reliable's sale of a used Volkswagen automobile to one Loda, and reporting that Loda made various complaints which Reliable endeavored to satisfy but without success. The letter embodies Reliable's report to W-W of its handling of the matter.

Other letters from Reliable Motor Sales Inc. and Reliable Volkswagen Sales to W-W are embodied in Exhibits 125 through 168 (categories 6 and 7) which relate to problems arising between Reliable and its customers, out of warranties or otherwise, inspection coupons for new cars, and other routine communications rendered necessary by and appropriate to the respective distribution and sales functions being performed by each of the parties. Nothing contained in any of the exhibits in these two categories constitutes an expression or admission of any terms of a franchise contract fixing the legal rights and liabilities of the parties other than the disclosure that W-W was a distributor of Volkswagen automobiles, that Reliable was an authorized retail dealer in such automobiles, and that W-W sold to Reliable the automobiles and parts which Reliable resold to its customers under a warranty running to the ultimate customer, obligating both the wholesaler and the retailer.

Exhibits 169–179, category 8, are letters from W-W to customers of Reliable, in some of which W-W refers to Reliable as "our dealer" but the contractual relationship, if any, between W-W and Reliable is not disclosed by any of these letters. Similarly, the notices referred to in category 9 addressed to "All authorized Volkswagen dealers" relating to termination of dealerships, simply evidences (1) that Reliable was an authorized Volkswagen dealer and (2) that certain other dealerships authorized by W-W were terminated. The notice in each instance requested the dealer to whom it was sent to correct his dealer list accordingly.

Categories 10, 11 and 12 (exhibits 199–282) consist of circular letters from W-W addressed to all authorized Volkswagen dealers, and disclosing the general objective of improving the market for Volkswagen vehicles and protecting the business of authorized dealers in that product. For example, exhibit 199 is a circular letter dated July 30, 1954 addressed to all authorized Volkswagen dealers upon the subject of wholesale sales of Volkswagen vehicles to unauthorized dealers. This notice reports that Volkswagen cars have been finding

their way into retail outlets not recognized by W-W as authorized dealers. The letter also states: "Since it is the intention of World-Wide Automobiles Corp. to protect their authorized dealers, this letter will serve as definite and final notification that sales of Volkswagen vehicles to unauthorized dealers will not be tolerated." Other circular letters report and suggest new features of Volkswagen cars, forms of advertising, increases in freight charges, color changes in vehicles, proportions of models to be expected from the factory, types of letterheads and forms, price change, new car warranties, service coupons, credit part provisions, and other information necessary and convenient for the assistance and direction of retail dealers and obtainable only from World-Wide. In these three categories (10, 11 and 12) there is nothing which brings any item thereof or the aggregate of the same, within the statutory definition of franchise. The relationship between the parties is no different than that which usually and necessarily exists between any wholesaler and his retail outlets.

Category 13 is comprised of miscellaneous documents sent by W-W to its dealers in the New York, New Jersey, Pennsylvania and Connecticut area, puffing the Volkswagen automobile, promising delivery acceleration, assuring equity in distribution among dealers, and providing for financing, instructions on servicing, etc. In the earliest of these miscellaneous communications, i.e., exhibit 283, W-W states that "each dealer will be protected against nearby competition because he will have an exclusive franchise in his area. In some cases this will cover hundreds of square miles."

This single embodiment of the word "franchise" does not suffice to bring any of the communications in category 13, or all of them in the aggregate, within the definition of franchise, as contained in Section 1221(b).

I find that the proof adduced fails to establish a "franchise" within the definition of the term as contained in the Act, 15 U.S.C. § 1221(b). The answer to the second question posed by the plaintiff being in the negative, I need not, and do not decide the first question.

An order may be submitted dismissing the third count of this consolidated action.