James O'NEAL, Jr., APAG Holdings, Inc., and APAG Orlando, Inc., Plaintiffs,

v.

GENERAL MOTORS CORPORATION and General Motors Acceptance Corporation, Defendants.

No. 92–741–Civ–Orl–22.

United States District Court, M.D. Florida, Orlando Division.

Dec. 10, 1993.

Ross Mathew Goodman, Levin, Middlebrooks, Mabie, Thomas, Mayes & Mitchell, P.A., Pensacola, FL, W. Stewart Gilman, W. Stewart Gilman, P.A., Apopka, FL, for plaintiffs.

Frank A. Shepherd, Gary M. Pappas, Popham, Haik, Schnobrich & Kaufman, Ltd., Miami, FL, Charles Martin Tatelbaum, Johnson, Blakely, Pope, Bokor, Ruppel & Burns, P.A., Clearwater, FL, for defendants.

---

**1.** Plaintiffs' arguments often ignore the differing positions and capacities held by each of them. Because of the disposition of the dealership claim, those differences are not presently material. References herein to Plaintiffs as parties to agreements, as operators or the like should

## MEMORANDUM OPINION

BAKER, United States Magistrate Judge.

This case is before the Court on the following matters:

(1) Motion by Defendant General Motors Acceptance Corporation (GMAC) to Dismiss the Second Amended Complaint, and Memorandum in Support Thereof (Doc. Nos. 60 & 63), and Plaintiffs' Response to Defendant GMAC's Motion to Dismiss (Doc. No. 71);

(2) Motion by Defendant GMAC for Summary Judgment, and Memorandum in Support Thereof (Doc. Nos. 61 & 64), and Plaintiffs' Memorandum in Opposition to GMAC's Motion for Summary Judgment (Doc. No. 72); and

(3) Renewed Motion by Defendant General Motors Corporation (GM) for Summary Judgment, and Memorandum in Support Thereof (Doc. Nos. 68 & 69), and Plaintiffs' Memorandum in Opposition to GM's Renewed Motion for Summary Judgment (Doc. No. 72).

Pursuant to 28 U.S.C. 636(c)(1), the parties have consented to proceed before the United States Magistrate Judge (Doc. No. 46). Based on the arguments made at the hearing and a review of the file and the relevant law, by separate order the Court grants GMAC's and GM's Motions for Summary Judgment (Doc. Nos. 61 & 68) as to Count I.

## I. STATEMENT OF FACTS

Plaintiffs James O'Neal, Jr., APAG Holdings, Inc., and APAG Orlando, Inc.,[1] claim to have entered a franchise relationship with Defendants GM and GMAC in which Plaintiffs were "automobile dealers" as defined under 15 U.S.C. 1221(c) and Defendants were "automobile manufacturers" as defined under 15 U.S.C. 1221(a) (Doc. No. 47 at 2). Plaintiffs allege a franchise relationship existed by virtue of the existence of written franchise agreements and a business plan confirmed in

therefore not be taken as precise statements. There is no need for present purposes to determine which of the Plaintiffs have enforceable rights (other than Dealership Act claims) arising from the agreements and arrangements.

writing for the Arnold Palmer Automotive Group (APAG) (Doc. No. 47 at 3).

In the late 1980s, Plaintiff O'Neal came up with a business plan for which a holding company, APAG Holding, would own various sub-corporations, including APAG Orlando, for the purpose of operating a nationwide chain of automobile dealerships (Doc. No. 72 at 2). As part of O'Neal's business plan, Plaintiffs entered into written franchise agreements with General Motors regarding several dealerships in other parts of the country, including Kerr Buick in Denver, Colorado, and Claremont Auto Park in Claremont, California (Doc. No. 47 at 4; Doc. No. 27 and Exhibits).

Also as a part of the business plan, O'Neal obtained from General Electric Capital Corporation (GE) a $90 million line of credit for financing the purchase by APAG Holdings, Inc., of various dealerships (Doc. No. 47 at 4 and Exh. A). Plaintiffs allege that GMAC issued a commitment to provide APAG a credit for $19.5 million, to aid Plaintiffs in financing the plan (Doc. No. 47 at 5 and Exh. C; Doc. No. 72, Attachment 21).

Pursuant to the plan, Plaintiffs entered into an agreement to purchase the assets of Braun Cadillac, Inc. (the Braun dealership), an Orlando, Florida automobile dealership which at the time of the signing of the agreement, August 1989, was party to a GM Cadillac Dealer Sales and Service Agreement. (Doc. No. 25; Doc. No. 47 at 5 and Exh. B; Doc. No. 72 at 2). GM had knowledge of the Braun–O'Neal purchase agreement as early as May 23, 1990 (Doc. No. 67 at 3). In March 1990, Plaintiffs and the Braun dealership entered into a management agreement whereby Plaintiffs became the operators of the Braun dealership (Doc. No. 72, Att. 14).

In September 1990, Plaintiffs and Defendant GMAC entered a consent to lease in which Plaintiffs agreed to lease the premises occupied by the Braun dealership in Orlando (Doc. No. 72, Att. 16). Plaintiffs claim that O'Neal and APAG Holdings paid over $760,000 directly to GMAC as part of the closing costs in purchasing the Braun dealership in September 1990 (Doc. No. 72 at 4, Att. 3). In addition, APAG paid over $580,000 directly to GMAC from June through September

of 1990 from funds derived from a Sun Bank loan (Doc. No. 72 at 4, attachment 20). GMAC in an intra-organization memo dated July 19, 1990, recognized APAG as "operating the [Braun] dealership since March 1990 under a management contract" (Doc. No. 73, attachment GC 00264).

Due to the existence of several franchise agreements between Plaintiffs and General Motors, the written agreement to transfer the assets of the Braun dealership to Plaintiffs, Defendants' knowledge of Plaintiff's purchase agreement with the Braun dealership, the management agreement between Plaintiffs and the Braun dealership, Defendants' knowledge of the credit arrangement with GE supporting the business plan, the acceptance by GMAC of funds from O'Neal and APAG, the consent to lease between Plaintiffs and GMAC, and the extension of a credit commitment by GMAC to Plaintiffs to acquire a chain of dealerships, Plaintiffs argue that a franchise relationship existed between Plaintiffs and Defendants regarding the Braun dealership (Doc. No. 47 at 3; Doc. No. 72 at 6). However, Plaintiffs do not allege the existence of an actual, written franchise agreement between the Plaintiffs and Defendants setting forth the legal rights and obligations specifically covering the Braun dealership (Doc. No. 47 and exhibits).

On December 4, 1990, the Circuit Court for the Ninth Judicial Circuit of Florida, Orange County, appointed a receiver in a foreclosure action brought by Sun Bank against Plaintiffs and several Braun entities to receive and take possession of the Braun dealership, following an alleged default on a Sun Bank loan (Doc. No. 72 at 15–16; Doc. No. 66, Exh. A). The Order Appointing Receiver provides that the receiver takes possession of the dealership premises, including all personal property ... "and such other property which may relate to the business operations of the automobile dealership trading under the name of Braun Cadillac wheresoever that property may be found" (Doc. No. 66, Exh. A at 2).

The court in its order granted the receiver "all of the rights, duties, authority, and responsibilities of a court appointed receiver,

including all functions necessary to continue the business operations of Braun Cadillac, Inc., APAG Holdings, Inc., and APAG Orlando, Inc." (Doc. No. 66, Exh. A at 3). The order allows the receiver "to enforce contracts or agreements to which the business trading under the name of Braun Cadillac is a party with respect to operating the dealership" (Doc. No. 66, Exh. A at 3). The order further provides that the receiver holds "all of the rights of Braun Cadillac, Inc. in the Cadillac Motor Car Division Dealer Sales and Service Agreement...." (Doc. No. 66, Exh. A at 3).

## II. GOVERNING LAW

### A. *Summary Judgment Standard*

■ Summary judgment is authorized if "the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir.1991). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

■ On a motion for summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510. The moving party bears the burden of proving that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552. In determining whether the moving party has satisfied the burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the nonmoving party, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255,

106 S.Ct. at 2513; *see Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. ANALYSIS

### A. *Jurisdiction*

Plaintiffs allege federal jurisdiction solely on the basis of the Automobile Dealers' Day in Court Act (the "Act"), 15 U.S.C. §§ 1221–1225, and 28 U.S.C. § 1331 (Doc. No. 47 at 2). Counts II through VIII allege breach of contract, fraud in the inducement, and other causes of action under Florida law over which the Court has supplemental jurisdiction (Doc. No. 47 at 11–20); 28 U.S.C. § 1367(a). If the Court finds that Count I cannot be sustained, Plaintiffs' state claims may be dismissed for lack of subject matter jurisdiction or may be retained in the Court's discretion, or under diversity jurisdiction (if it exists). 28 U.S.C. 1367(c)(3); 28 U.S.C. 1332; *Edwards v. Okaloosa County*, 5 F.3d 1431, 1433 (11th Cir.1993).

### B. *Automobile Dealers' Day in Court Act Claim*

■ The principal issue before the Court is whether the Plaintiffs are entitled to the protections of the Act. Count I of Plaintiffs' Second Amended Complaint alleges a breach of good faith and violation of the Act (Doc. No. 47 at 2, 10). Defendants GM and GMAC argue that Plaintiffs do not have a claim under the Act, because they were not parties to a written franchise agreement (Doc. No. 63 at 4; Doc No. 64 at 5). Section 1222 of the Act provides:

> An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides ... and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer ... to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer....

An "automobile dealer" thus has a claim against an "automobile manufacturer" for failure of the manufacturer to act in good faith in performing or complying with the terms of the franchise. Section 1221(c) defines "automobile dealer" as:

> ... any person, partnership, corporation, association, or other form of business enterprise resident in the United States or in any Territory thereof or in the District of Columbia operating under the terms of a franchise and engaged in the sale or distribution of passenger cars, trucks, or station wagons.

An "automobile dealer" thus is one "operating under the terms of a franchise."

Section 1221(b) defines "franchise" as:

> ... the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract.

Therefore, under the plain language of the Act, a plaintiff dealer must possess a "written agreement or contract" between itself and an automobile manufacturer to invoke the Act's protections.

 Without a written franchise, there can be no claim or cause of action under the Act. *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59, 63 (9th Cir.1973). A *sine qua non* to recovery is proof of a *written* contract which "purports to fix the legal rights and liabilities of the parties...." *Reliable Volkswagen Sales & Service Co. v. World–Wide Automobile Corp.*, 216 F.Supp. 141, 144 (D.C.N.J.1963). Only a signatory to a written franchise agreement can be held accountable for performing or complying with it. *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.*, 461 F.2d 608, 613 (7th Cir.1972). Oral representations with respect to a franchise cannot supply the basis for a claim under the Act. *York Chrysler–Plymouth, Inc. v. Chrysler Credit Corp.*, 447 F.2d 786, 791 (5th Cir.1971); *Southern Rambler Sales, Inc. v. American Motors Corp.*, 375 F.2d 932, 934–5 (5th Cir.1967), *cert. den.*, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967).

Plaintiffs argue, first, that even if O'Neal and APAG were never the dealer, *Colonial Ford, Inc. v. Ford Motor Co.*, 592 F.2d 1126 (10th Cir.1979), and *Stamps v. Ford Motor Co.*, 650 F.Supp. 390 (N.D.Ga.1986), hold that pre-franchise formation bad faith can be actionable under the Act. In *Colonial*, the court held that pre-franchise events required by the manufacturer as preconditions to the granting of a franchise became part of the franchise for purposes of the Act. 592 F.2d at 1128. However, *Colonial* is distinguishable because an actual franchise agreement did come into existence between the parties, with the issue being whether events prior to the franchise were incorporated. *Id.* Here, no written franchise agreement was ever signed between these parties as to this location.

In *Stamps*, the court found a wholly-owned subsidiary of a manufacturer to be an agent of the manufacturer and thus liable under the Act, despite not being a party to a franchise agreement between the dealer and manufacturer. 650 F.Supp. at 396. *Stamps* also is distinguishable, however, in that a franchise agreement between dealer and manufacturer existed, whereas none of the Plaintiffs and Defendants in this case never became parties to a franchise agreement.

Plaintiffs argue, second, that a written agreement is not a prerequisite to the act, citing *Lewis v. Chrysler Motors Corp.*, 456 F.2d 605 (8th Cir.1972), for support. However, *Lewis* merely held that the district court erred in dismissing the action after finding, based on the pleadings alone, that the contract between the plaintiff and the defendant manufacturer revealed the plaintiff not to be a dealer under the Act, without taking testimony or affidavits to interpret the contract. *Id.* at 606. Here, no written franchise agreement has been alleged, despite the submission of affidavits and other documents. Hence, *Lewis* is inapplicable, because a contract alleged to be the franchise agreement existed in that case.

Plaintiffs argue that in *Kavanaugh v. Ford Motor Co.*, 353 F.2d 710, 715 (7th Cir.1965), the court rejected the contention that the Act "requires a person to be a 'party' in the strict legal sense of the written franchise agree-

ment with the automobile manufacturer." However, *Kavanaugh* involved the issue of whether an individual operator could have standing to sue under the Act, even though the franchise agreement was between the manufacturer and a corporate entity designated as the dealer. *Id.* at 712.

Because the operator, Kavanaugh, was president and director of the dealer corporation and was essential to the dealership's operation, the court "pierce[d] the veil" of the corporate entity and found Kavanaugh to be the dealer under the Act. *Id.* at 717. In so doing, the court looked to three instruments to find an integrated franchise agreement between Kavanaugh and the manufacturer. *Id.* at 715. Thus, the court found a limited exception to the general rule requiring that only parties to a franchise agreement may have standing under the Act, where the corporate entity dealership is a fiction placed between the individual operator and manufacturer.

*Kavanaugh* is distinguishable from this case in that a written franchise agreement existed between the corporate entity and Ford, which was held to extend to Kavanaugh through two other agreements. In this case, however, no franchise agreement exists between GM or GMAC and O'Neal or the APAG entities granting Plaintiffs the Braun franchise. Therefore, *Kavanaugh* is not controlling.

Plaintiffs cite *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556, 563 (2d Cir.1970) and *H.C. Blackwell Co., Inc. v. Kenworth Truck Co.*, 620 F.2d 104, 107 (5th Cir.1980), for the proposition that a dealer may sue under the Act without being a party to an existing franchise agreement. However, those cases are distinguishable in that they involved former dealers with expired franchises. In both cases, the courts extended the Act's protections to dealers without presently-enforceable franchise agreements but with expired or terminated franchise agreements, because otherwise the Act's protections against bad faith terminations or non-renewals of franchises could not be implemented. As Plaintiffs never had a franchise agreement that expired or was terminated, these cases do not control.

Other cases cited by Plaintiffs involve, as in *Kavanaugh*, whether a shareholder or officer of a corporation which is the dealer under a franchise agreement may have standing under the Act. *See, e.g., DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 550 F.Supp. 1199 (N.D.Ill.1982); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429 (9th Cir.1979); *Vincel v. White Motor Corp.*, 521 F.2d 1113 (2d Cir.1975); *Conroy Datsun Ltd. v. Nissan Motor Corp. in U.S.A.*, 506 F.Supp. 1051 (N.D.Ill.1980); *Moorehead v. General Motors Corp.*, 442 F.Supp. 873 (E.D.Pa.1977). Because this case (at least at this stage) does not involve the issue of shareholder standing under the Act, these cases are inapposite.

■ The evidence presented by Plaintiffs supporting the existence of a franchise agreement is the existence of other alleged franchise agreements between Plaintiffs and Defendants, a commitment by GMAC to extend a line of credit of $19.5 million as part of Plaintiffs' business plan, a purchase agreement between Plaintiffs and the Braun dealership to acquire the dealership's assets, and the knowledge of Defendants that Plaintiffs had entered a purchase agreement and were operating the Braun dealership (Doc. Nos. 47, 72).

These circumstances, individually or collectively, do not amount to a "franchise" agreement nor do they serve to excuse its absence. Agreements as to other locations cannot give rise to obligations under the Act for a location or activities not within the scope of those other agreements. GMAC's participation in financing Plaintiffs' business plan may give rise to rights and obligations as set forth in the undertakings of the parties. A financing commitment is not, however, enforced according to the special rules of the Act where there is no franchise agreement. Plaintiffs' contract and operational relationships with Braun, even though well known to Defendants, cannot create a franchise between Plaintiffs and Defendants. Moreover, Plaintiffs never formally closed the acquisition. At most, Plaintiffs can claim some equitable right to assume *Braun's* dealership rights by virtue of their agreements and activities.

Pursuit of that potential claim is discussed below.

Because the Plaintiffs have failed to show through their pleadings, affidavits, and related exhibits and attachments the statutory requirement of the existence of a written franchise agreement between Plaintiffs and Defendants, the Plaintiffs are not protected by the Act. Simply stated, though they made efforts to do so, these Plaintiffs never achieved the contract status needed to be entitled to the special protections afforded automobile dealers under the Act.

### C. Appointment of a Receiver

The only written, operative dealership agreement applicable to Braun Cadillac is the one entered into by Braun and GM. Plaintiffs were parties to an agreement to acquire Braun's assets including the dealership. In addition, Plaintiffs actually managed the dealership for a period of time. These circumstances, had they continued, could conceivably have given Plaintiffs some standing or right to enforce statutory rights under the Braun dealership.

However, Defendants argue that any cause of action under the Act as to the Braun dealership can only be pursued by the receiver appointed by the Circuit Court, not the plaintiffs. Thus, Defendants argue that Defendants are entitled to summary judgment on this ground as well.

The capacity of a receiver to sue in federal court is governed by the law of the forum state. *Meyers v. Moody*, 693 F.2d 1196, 1205 (5th Cir.1982, *cert. den*, 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983)). Under Florida law, once a receiver is appointed for a business, the business loses power to transfer or otherwise act with regard to the property subject to the receivership. *Sunland Mortgage Corp. v. Lewis*, 515 So.2d 1337, 1339 (Fla.App.1987). The property of an entity in receivership includes any causes of action available to that entity:

> The general rule is that "a receiver takes the rights, causes and remedies which were in the corporation, individual or estate whose receiver he is, or which were available to those whose interests he was

appointed to represent." *Hamilton v. Flowers*, 134 Fla. 328, 183 So. 811, 817 (1938).

Accordingly, the receiver is the real party in interest as to a cause of action and the one with the right to sue. *Richardson v. South Florida Mortgage Co.*, 102 Fla. 313, 136 So. 393, 395 (1931). Additionally, the receiver has the concomitant right to settle any claim or potential claim. *See Bancroft v. Allen*, 138 Fla. 841, 190 So. 885 (1939); *Fugazy Travel Bureau, Inc. v. State*, 188 So.2d 842 (Fla.App.1966).

Plaintiffs admit that a receiver was appointed by the Circuit Court (Doc. No. 72 at 16). However, Plaintiffs argue that the receiver does not have the capacity to bring a cause of action against Defendants regarding the Braun dealership, because the court did not expressly authorize the receiver to bring such an action (Doc. No. 72 at 18).

Plaintiffs argue that a receiver is merely an arm of the court, not a party to an action, and may only act under the supervision and control of the court. *Bancroft v. Allen*, 138 Fla. 841, 190 So. 885, 890 (1939); *Fugazy Travel Bureau, Inc. v. State*, 188 So.2d 842 (Fla.App.1966). Plaintiffs further argue that the receiver must be expressly authorized to bring suit before it has the standing of a party. *Richardson v. South Florida Mortgage Co.*, 102 Fla. 313, 136 So. 393, 395 (1931).

While Plaintiffs are correct that a receiver is subject to the supervision and control of the court that appoints it, this position is not inconsistent with the rule that a receiver obtains the rights and property interests of the entity it is substituting for. *Sunland Mortgage Corp. v. Lewis*, 515 So.2d 1337, 1338–1339 (Fla.App.1987). In addition, the Order Appointing Receiver expressly grants the receiver all of the tangible and intangible property interests relating to the business operations of the Braun dealership (Doc. No. 66, Exh. A at 2), as well as all of the rights and responsibilities necessary to continue the business operations of the Braun dealership, the authority to enforce contracts to which the Braun dealership is a party, and the authority to hold all of the rights the Braun dealership possessed under

its franchise with Defendants (Doc. No. 66 at 3).

Even if further authorization from the Circuit Court would be needed for the *receiver* to prosecute a dealership claim, it does not follow that *these Plaintiffs* may pursue the cause of action (if there is one) *for their own benefit* in disregard of the receivership. Plaintiffs have not shown that they sought to compel the receiver to pursue this asset or to have a supplemental receiver appointed for that purpose.

■ Because Plaintiffs lost the ability to enforce directly whatever rights and interests were possessed by the Braun dealership upon appointment of a receiver, Plaintiffs do not "own" the causes of action they assert against Defendants and thus lack standing to bring the claims against Defendants. Accordingly, summary judgment for Defendants is appropriate.

## IV. CONCLUSION

Defendants have shown the absence of any genuine issues of material fact as to Count I of Plaintiffs' Second Amended Complaint and as to the appointment of a receiver. Accordingly, Defendants' Motions for Summary Judgment dismissing Count I are granted by separate Order.