**Thomas A. GASSETT, et al., Plaintiffs,**

v.

**NISSAN N.A., INC., et al., Defendants.**

**Civ. No. 1993–100.**

District Court, Virgin Islands,
D. St. Thomas & St. John.

Dec. 21, 1994.

George Marshall Miller, St. Thomas, U.S. VI, for plaintiffs.

Mary Faith Carpenter, and Dudley, Clark & Chan, St. Thomas, U.S. VI, for defendants Nissan N.A., Inc., and Bank of Nova Scotia.

John H. Benham, III, and Watts, Streibich & Benham, St. Thomas, U.S. VI, for defendant Motorambar, Inc.

### MEMORANDUM AND ORDER

FRANK A. KAUFMAN, Senior District Judge.

(1) Reference is hereby made to defendant Motorambar, Inc.'s November 3, 1994 motion for summary judgment, defendant The Bank of Nova Scotia's November 7, 1994 motion for summary judgment, and to all other filings in this case.

(2) In this case, plaintiffs, Thomas Gassett (hereinafter "Mr. Gassett") and G.S. Industries, Inc. (hereinafter "GSI") state, in five counts, five claims against defendants Nissan of North America, Inc. (hereinafter "Nissan"), Motorambar, Inc. (hereinafter "Motorambar"), and The Bank of Nova Scotia (hereinafter "BNS"). In Count I, both plaintiffs allege that defendants Nissan and Motorambar violated the Federal Automobile Dealers' Day in Court Act, 15 U.S.C. § 1221 *et seq.* (hereinafter "federal dealer act"), by terminating plaintiffs' Nissan franchise in bad faith. In Count II, both plaintiffs allege that defendants Nissan and Motorambar violated 12A V.I.C. § 131 by failing to give plaintiffs at least 120 days notice prior to terminating the Nissan franchise; violated 12A V.I.C. § 132 by terminating the franchise without good cause; and violated 12A V.I.C. § 134 by engaging in unfair competition. In Count III, both plaintiffs allege that defendants Nissan and Motorambar engaged in discriminatory "maldistribution" of vehicles in violation of the federal anti-trust laws. In Count IV, Mr. Gassett (but not GSI) alleges that defendant BNS interfered with plaintiff's business relationship by wrongfully denying credit. In Count V, both plaintiffs allege that all defendants, through a pattern of racketeering, violated the Racketeer Influenced and Corrupt Organizations Act (RICO).

Defendant Nissan is a corporation incorporated in California with its principal place of business in that state. Defendant Motorambar is a corporation formed pursuant to the laws of the Commonwealth of Puerto Rico

with its principal place of business in San Juan, Puerto Rico. Defendant BNS is a banking organization organized under the laws of the Dominion of Canada and has done business with plaintiffs in St. Thomas, U.S. Virgin Islands. Plaintiff GSI is a corporation organized under the laws of the U.S. Virgin Islands with its principal place of business in St. Thomas, U.S. Virgin Islands. Plaintiff Mr. Gassett is a citizen of the U.S. Virgin Islands. Diversity jurisdiction is present pursuant to 28 U.S.C. § 1332. Additionally, because federal questions have been asserted under Counts I, III, and V, subject matter jurisdiction is present with respect to those counts under 28 U.S.C. § 1331 and supplemental subject matter jurisdiction seemingly exists as to Counts II and IV pursuant to 28 U.S.C. § 1367.

(3) On October 18, 1994 the parties stipulated to the voluntary dismissal of Nissan from the within case and also stipulated to the dismissal of all of the class action claims which were originally stated by plaintiffs in one or more counts of the complaint. Additionally, during an October 28, 1994 on-the-record telephone conference, the parties orally informed this Court that they were stipulating to the dismissal of the RICO allegations stated in Count V. Further, on October 27, 1994, this Court filed a Memorandum and Order dismissing the contentions of the corporate plaintiff, GSI, with respect to Count II on limitations grounds and because of failure to pay certain Virgin Islands taxes. Therefore, the only issues remaining before this Court are set forth in: Count I, Count II (with regard to the individual plaintiff only); Count III; and Count IV.

(4) The facts in this case, unless indicated otherwise, are undisputed. The case is related to an earlier bankruptcy proceeding, namely, *In re: West Indies Automotive Corp. et. al,* (D.V.I., Bankr. No. 368–00006). Motorambar is the distributor of Nissan vehicles in the Caribbean region. The West Indies Automotive Corporation (hereinafter "WIAC") sold Nissan vehicles and other vehicles, at retail, to members of the public. Before WIAC filed for bankruptcy, Motorambar sold Nissan vehicles to WIAC. In May 1988, Motorambar notified WIAC that Motorambar was terminating its relationship with WIAC. In July 1988, WIAC filed for bankruptcy protection. During the course of that bankruptcy litigation, a dispute arose between the trustee in bankruptcy and Motorambar regarding the assignability of the prior agreement between Motorambar and WIAC. Motorambar asserted that its prior relationship with WIAC had been entirely severed and that the trustee in bankruptcy had nothing to assign. However, at the same time, Motorambar began to negotiate with Mr. Gassett and GSI to sell Nissan vehicles to GSI. Eventually Motorambar and the trustee reached an agreement, in the form of a stipulation, which Judge Brotman[1], approved on September 28, 1989.[2] The stipulation provided, *inter alia,* that the "trustee may, for good and valuable consideration, transfer and assign whatever interest, if any, the estate may have in a Nissan dealership;"[3] that "Motorambar has agreed to sell Nissan vehicles to Gassett on a non-exclusive basis;"[4] and that "Motorambar reserves the right to reassert its position that no franchise was granted to the Debtor [WIAC] and that the Debtor's relationship with Motorambar was terminated prior to the initiation of bankruptcy ..."[5] The agreement reached by Motorambar and the trustee was accompanied by a termination of the dispute in the bankruptcy court concerning the assignability of rights under the prior Motorambar–WIAC relationship or agreement.

Subsequent to terminating its relationship with WIAC and prior to selling vehicles to Mr. Gassett and/or GSI, Motorambar sold Nissan vehicles to another St. Thomas dealer—Caribbean Nissan. While Mr. Gassett was negotiating with Motorambar and the WIAC trustee, he also entered into negotia-

---

1. Judge Stanley S. Brotman, Senior United States District Judge of the District of New Jersey, sitting by designation in this Court.

2. *See* Appendix to defendant Motorambar's motion for summary judgment at 120–124.

3. *Id.* at 122–23.

4. *Id.* at 121.

5. *Id.* at 123.

tions with Caribbean Nissan's owners to acquire that business and to obtain "a successful transfer of a Nissan franchise from 'Caribbean' to 'Gassett'."[6] Eventually, Mr. Gassett entered into a contract pursuant to which he and/or GSI would acquire Caribbean Nissan and its assets. In addition to the sale of the business assets, the contract provided for certain future employment by GSI of Caribbean Nissan's former owners. Once it entered into the contract, Caribbean Motors advised Motorambar of the pending sale. After it was so advised, Motorambar advised Caribbean Motors that it could conduct business with Mr. Gassett and/or GSI as it wished, but that no franchise existed and that Caribbean Nissan "cannot transfer what [it does] not have."[7] Caribbean Nissan and Mr. Gassett (and/or GSI) then amended their agreement on May 22, 1989 to refer to "[the] successful transfer of the Nissan *business arrangement* between Caribbean and Motorambar to Gassett."[8]

Beginning in June 1989, GSI began to order Nissan vehicles from Motorambar. Shortly after Motorambar began selling Nissan vehicles to GSI, a dispute, which eventually resulted in one or more lawsuits, arose between Mr. Gassett and/or GSI and the former owners of Caribbean Nissan concerning the employment of Caribbean Nissan's former owners by GSI. During the course of that dispute, both Mr. Gassett and his attorney asserted that Caribbean Nissan had no franchise to transfer to Mr. Gassett and/or GSI.[9] Later, Mr. Gassett and/or GSI may have reversed that position.[10]

While he was involved in the aforementioned dispute with Caribbean Nissan's former owners, Mr. Gassett and/or GSI disputed the trustee's demand for payment with regard to Motorambar's agreeing to sell Nissan vehicles to GSI. Eventually, Mr. Gassett and/or GSI and the trustee signed a settlement agreement, which was filed with the bankruptcy court.[11] Motorambar, however, objected to part of that agreement which called for the purchase of all assets of WIAC, including "the WIAC new car dealership *franchises* for the sale and service of Nissan ..."[12] Because of Motorambar's objections to that language, the assignment document was changed to state that "all of WIAC's right, title and interest in and to a [sic] *Nissan dealership,* all in accordance with the stipulation between Motorambar and the trustee [be assigned]."[13] In September 1989, Mr. Gassett, in his role as president of GSI, and BNS entered into an agreement to provide financing for the purchase by GSI of new Nissan vehicles on a floor plan basis. When GSI ordered vehicles from Motorambar, the normal procedure was for Motorambar to send a sight draft to BNS. BNS would subsequently confirm that GSI had funds on hand or credit available so that BNS would honor the sight draft.

The crux of the instant action arises from an order for vehicles which GSI placed with Motorambar in late October 1990. In connection with that order for vehicles, Motorambar wrote a sight draft dated November 15, 1990. On that same date, that is, November 15, 1990, while the vehicles ordered in October were en route and after Motorambar had written the sight draft, the Ford Motor Company, which provided certain financing to GSI, filed a multi-million dollar lawsuit against GSI and Mr. Gassett. Almost immediately, GSI and a related corporation filed a bankruptcy petition.[14] On November 16, 1990, upon learning of that bankruptcy petition, BNS sent a letter to Motorambar stating that BNS "would be unable to honor the sight draft dated November 15, 1990 for $106,821.20."[15] Plaintiffs contend that the sight draft dated November 15, 1990 was presented on November 15, 1990, before the

6. *Id.* at 105.

7. *Id.* at 107.

8. *Id.* at 106 (emphasis added).

9. *Id.* at 97–98 and 102.

10. *Id.* at 110 and 115.

11. *Id.* at 125–30.

12. *Id.* at 125 (emphasis added).

13. *Id.* at 36 (emphasis added).

14. *Id.* at 164–69.

15. *Id.* at 142.

bankruptcy petition was filed by GSI on November 16, 1990, and that, therefore, BNS's dishonor of that sight draft was unlawful. There is no dispute that it was not until November 16, 1990 that BNS was informed of the bankruptcy petition and that on that date, namely, November 16, 1990, BNS notified Motorambar that it would not honor the sight draft.[16] However, BNS states that the sight draft had not been presented to it when BNS first learned of that petition.[17] Thus, BNS disputes plaintiffs' statement that the November 15, 1990 sight draft was presented to BNS on November 15, 1990. In any event, GSI made no alternative arrangements for payment to Motorambar and the vehicles were returned to Puerto Rico on November 26.[18] On November 28, 1990, the bankruptcy proceeding which GSI had earlier initiated was dismissed.[19]

It is to be noted that plaintiffs and BNS have stated an underlying factual dispute and accordingly, a resulting legal dispute concerning effect of BNS's dishonoring of the November 15, 1990 sight draft. On December 5, 1994, in a Memorandum to Counsel, this Court afforded to the parties the opportunity to present evidence, in proper Federal Civil Rule 56 form, regarding the facts of the presentment of the sight draft. Thereafter, BNS, in appropriate form, timely submitted such information.[20] Plaintiffs have not responded to the said filing. Accordingly, this court will consider the statements in defendant's proffered evidence as true. *See* Federal Civil Rule 56(e).

On March 11, 1991, after receiving no orders from GSI in January or February of that year, Motorambar notified Mr. Gassett and GSI that it was terminating its relationship with them effective July 31, 1991 because of GSI's unsatisfactory performance.[21] Mr. Gassett and/or GSI responded to that notice of termination by threatening suit.[22] Since July 1991, Motorambar has sold no further vehicles to GSI. Mr. Gassett and GSI commenced the instant action in June 1993.

(5) Defendants assert that they are entitled to the grant of their pending summary judgment motions since no genuine issues of material fact exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Petruzzi's IGA Supermarkets v. Darling–Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir.1993). When reviewing a motion for summary judgment, "all reasonable inferences ... [must be drawn] in the light most favorable to the non-moving party" *Petruzzi's* at 1230. *See also Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992), *cert denied* —— U.S. ——, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993). Ultimately, however, the non-movant bears the burden of presenting a genuine issue of material fact. The nonmovant "may not rest upon the mere allegations or denials of [his or her] pleadings ... [but instead] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must, therefore, "go beyond the pleadings and by [its] own affidavits, ... depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the non-movant's evidence is "merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted). "The mere existence of a scintilla of evidence in support of plaintiff's case will be insufficient; there must be evidence on which the jury could

---

**16.** *Id.*

**17.** "After learning of [Mr.] Gassett's pending bankruptcy petition, and before the sight draft was presented, Mr. Culliton of the Bank advised Motorambar that the Bank would be unable to honor the sight draft if presented." *See* Affidavit of Mr. James Batterton, Vice President and Manager of BNS at ¶ 7.

**18.** *See* Appendix to defendant Motorambar's motion for summary judgement at 179–80.

**19.** *Id.* at 143.

**20.** *See* note 17, *supra*.

**21.** *Id.* at 39–40.

**22.** *Id.* at 131–33.

reasonably find for the non-moving party." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

▮ (6) In general, a stockholder, officer, or employee of a corporation may not recover for damages to him or to her as an individual, if those damages are derived from an injury to the corporation.[23] In the instant case, the harms allegedly suffered by Mr. Gassett as the individual plaintiff in the within case are derivative of the harms suffered by the corporate plaintiff.[24] GSI, not Mr. Gassett, purchased and sold vehicles.[25] Title to the vehicles was transferred from Motorambar to GSI, not to Mr. Gassett.[26] At one point in his deposition Mr. Gassett stated that "towards the end," personal monies were used to buy vehicles.[27] Nevertheless, the record establishes that the transactions concerning the vehicles were conducted by and through GSI, not by and through Mr. Gassett as an individual. One of Mr. Gassett's deposition statements sums it up best; "[W]e use a corporation to do business."[28]

Each of the counts relates to harms suffered by the corporation. GSI allegedly suffered business loss as a result of Motorambar's wrongful termination of its relationship with GSI. Any injury suffered by Mr. Gassett, the corporate president of GSI, is derived from GSI's injury. Additionally, any harm resulting from Motorambar's alleged failure to give proper notice to Mr. Gassett, is derived from harm to GSI. Similarly, assuming *arguendo* only, the validity of any of the anti-trust violations stated in Count III, any such harms suffered by Mr. Gassett

are derivative of harms suffered by GSI, the company allegedly injured by the wrongful competition. Finally, BNS entered into the financing agreement with Mr. Gassett not in Mr. Gassett's capacity as an individual, but in his capacity as the corporate president of GSI.[29] The record discloses that any harm suffered was not incurred by Mr. Gassett personally. Accordingly, defendants are entitled to the grant of summary judgment with regard to all claims for damages which Mr. Gassett personally and individually asserts in this case.

▮ (7) The federal dealer act relied on by plaintiffs in Count I of the complaint, creates a cause of action for automobile dealers against automobile manufacturers for the bad faith termination of a franchise agreement. 15 U.S.C. § 1222. That statute defines "automobile manufacturer" as

... any person, partnership, corporation, association, or other form of business enterprise engaged in the manufacturing or assembling of passenger cars ... including any person, partnership or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles.

15 U.S.C. § 1221(a). Defendant Motorambar is a distributor of Nissan vehicles and does not "assemble" or "manufacture." In their opposition to summary judgment, plaintiffs argue that Motorambar is sufficiently controlled by Nissan to fall within the § 1221(a)

---

**23.** *See Pitchford v. PEPI, Inc.*, 531 F.2d 92, 96–97 (3d Cir.1975), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976) (involving federal anti-trust laws); *Temp-way Corp. v. Continental Bank*, 139 B.R. 299 (E.D.Pa.1992), *aff'd without op.* 981 F.2d 1248 (3d Cir.1992); and *Pemberton Sales and Service v. Banco Popular de Puerto Rico*, Civil No. 1993–07, 877 F.Supp. 961 (D.V.I.) Memorandum and Order filed November 7, 1994. *See also* cases involving the federal anti-trust laws and/or federal dealer act: *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439–40 (9th Cir.1979); and *Conroy Datsun, Ltd. v. Nissan Motor Corp.*, 506 F.Supp. 1051, 1055 (N.D.Ill.1980).

**24.** Mr. Gassett was the sole stockholder of his subchapter S corporation. While such a corporation may provide certain income tax benefits, as well as offer the liability protection which

corporate status itself affords to its stockholders, the stockholder of such a corporation cannot escape the effect of the legal principle that he or she may not personally recover if the harm suffered by him or her is derivative of the harm suffered by the corporation.

**25.** *See* Deposition of Mr. Thomas Gassett at 181.

**26.** *Id.* at 183.

**27.** *Id.* at 182.

**28.** *Id.* at 181.

**29.** *See* Exhibit A, defendant Bank of Nova Scotia's motion for summary judgment in which BNS wrote to Mr. Gassett in his capacity as President of GSI.

definition. However, as set forth in its response to interrogatories,[30] Motorambar is independent from Nissan, the manufacturer. Nissan conveys the title of vehicles to a purchasing agent, Dai–Ichi Trading Company. Dai–Ichi then conveys the vehicles to Motorambar. Once Motorambar obtains title, the vehicles are sold directly by Motorambar to dealers with which Motorambar has a business relationship. Additionally, Motorambar's officer, Mr. Luis Machado, stated in his deposition that Nissan played no role in guiding marketing, pricing, or quotas. Further, he stated that Nissan retained no title interest in the vehicles and that title passed directly from Motorambar to the dealer.[31] In *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59, 64–66 (9th Cir.1973), the distributor involved was held not to be a manufacturer within the meaning of the federal dealer act because the distributor purchased parts and automobiles from the manufacturer, obtained title thereto, could resell at wholesale to any dealer or at retail to any person, could resell at any price, and assumed the credit risks for automobiles sold.[32] Similarly, Motorambar obtained parts and vehicles from Nissan but is otherwise independent of Nissan.[33]

Plaintiff cites to *De Cantis v. Mid–Atlantic Toyota Distributors, Inc.*, 371 F.Supp. 1238 (E.D.Va.1974), for the proposition that control of a distributor need not be in the form of corporate affiliation or a traditional principal-agent relationship. Instead, control can be shown by sufficient direct dealing between the manufacturer with the distributor. *Id.* at 1244. However, in *De Cantis,* the manufacturer maintained continuing and wide-spread control over many aspects of the distributor's dealers, including but not limited to, the number and identity of each dealer and prior approval of each "dealer selling agreement." *Id.* at 1244–45. In the instant case, there is no showing that Nissan so controlled, or had the right so to control Motorambar.[34] Accordingly, Motorambar has shown that it operated independently of Nissan and cannot, therefore, be defined as a "manufacturer" under the federal dealer act.

█ In addition to being unable to show that Motorambar is a "manufacturer" as defined by the act, plaintiffs are unable to show that a "franchise" existed between GSI and/or Mr. Gassett and Motorambar as required by the federal dealer act.

> The term "franchise" shall mean the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such an agreement or contract.

15 U.S.C. § 1221(b). No written agreement existed between Motorambar and GSI and/or Mr. Gassett. In *Stansifer v. Chrysler Motors Corp.*, 487 F.2d 59 (9th Cir.1973), the Ninth Circuit wrote "[i]t is clear that without a written franchise there can be no claim of cause of action under the [federal dealer act]." *Id.* at 63. *See also O'Neal v. General Motors Corp.*, 841 F.Supp. 391, 396 (M.D.Fla. 1993).

Plaintiffs claim that the stipulation, entered between Motorambar and the WIAC trustee, forms the basis for a franchise. However, neither GSI nor Mr. Gassett was a party to the stipulation. Further, the stipulation explicitly gave Motorambar the right to reassert its position that no franchise ex-

---

**30.** *See* Appendix to defendant Motorambar's motion for summary judgment at 43.

**31.** *See* Deposition of Luis Machado, at 68–69 and 82–83.

**32.** *See also Tom Sullivan Porsche Audi Co. v. SCU Industries,* 342 F.Supp. 738, 741 (E.D.Mich. 1972) (absent showing that distributor was controlled by manufacturer, plaintiff cannot recover against the distributor under the federal dealer act); *North Broadway Motors v. Fiat Motors of North America,* 622 F.Supp. 466, 472 (N.D.Ill. 1984).

**33.** Plaintiffs claim that because Motorambar requests that dealers service vehicles according to Nissan's recommendations, there is sufficient control. However, nothing has been presented to indicate that the administration of a routine service policy amounts to the type of control by the manufacturer contemplated by the federal dealer act.

**34.** In fact, Mr. Gassett states, in his deposition at 140, that his experience showed that distributors like Motorambar acted as independent businessmen.

isted between WIAC and Motorambar.[35] Since plaintiffs are not parties to the stipulation, the document hardly constitutes a written agreement between the manufacturer and the dealer as required by the Act. *See O'Neal,* 841 F.Supp. at 396 (citations omitted).

In their opposition to summary judgment, plaintiffs also claim that the assignment, stipulation and correspondence between Motorambar and GSI and/or Mr. Gassett amount to a franchise under the holding in *Kavanaugh v. Ford Motor Co.,* 353 F.2d 710 (7th Cir.1965). In *Kavanaugh* the plaintiff left Chevrolet to become a Ford dealer. Both plaintiff and defendant owned shares of the Ford dealership and three written documents described their "association." *Id.* at 712–14. After examining the documents, the court concluded that a franchise existed as defined by 15 U.S.C. § 1221(b). The court reasoned that the documents amounted to an "integrated franchise" sufficient to create a cause of action under the federal dealer act. *Id.* at 715. For several reasons the *Kavanaugh* decision is inapplicable in the instant case. For one thing, Motorambar did not play the type of active role which the defendant in *Kavanaugh* played. Further, the written documents which exist in the within case do not clearly establish the existence of a franchise under the federal dealer act. In the complaint in this case, plaintiffs refer to the trustee's assignment as the written agreement.[36] That assignment, to which Motorambar was not a party, specifically refers to a Nissan *dealership,* not a franchise. The trustee in bankruptcy could only transfer those rights which WIAC held. During the deposition of GSI, Mr. Gassett admitted that he himself had no knowledge of any written agreement, let alone a franchise agreement, between WIAC and Motorambar.[37] Mr. Gassett also stated that he never received a written agreement from Motorambar.[38]

Eventually, during a deposition proceeding in the Ford suit, Mr. Gassett keyed in on the heart of the franchise issue when he admitted that he had "a verbal agreement with Nissan." [39] Such an oral agreement does not meet the written requirements of § 1222(b) and "cannot supply a basis for a claim under the Act." *O'Neal,* 841 F.Supp. at 396 (citations omitted).

Plaintiffs' argument that the correspondence with Motorambar somehow created a franchise is also without merit. In *Reliable Volkswagen Sales and Service Co. v. World–Wide Auto Corp.,* 216 F.Supp. 141 (D.N.J. 1963), the court determined that despite the fact that the plaintiff submitted more than two-hundred-ninety (290) documents, *id.* at 153, no franchise agreement existed within the meaning of the Act.[40] *Id.* at 156. Despite the volume of communications and content thereof, the court concluded that World–Wide was simply a distributor which was authorized to sell Volkswagen products, making the relationship not one rooted in franchise, but rather one of wholesaler to retailer. *Id.* at 154. In the instant case, plaintiffs have produced no evidence on the scale of *Reliable Volkswagen.* Assuming *arguendo* only that the plaintiffs have done so, *Reliable Volkswagen* indicates that mere course of dealing and documents related thereto do not add up to a franchise under the federal dealer act.

■ In addition to not having demonstrated that Motorambar is a "manufacturer" or that a "franchise" existed, GSI has not shown that Motorambar engaged in "commerce" as defined by the Act.

The term commerce shall mean commerce among the several States of the United States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or among the Territories or between any Territory and

---

35. *See* Appendix to defendant's motion for summary judgment at 123.

36. *See* Second amended complaint at ¶¶ 15 & 16.

37. *See* Deposition of Mr. Gassett at 191.

38. *Id.* at 193.

39. *See* Appendix to defendant's motion for summary judgment at 26.

40. Documents submitted included correspondence from World–Wide to Reliable; telegrams concerning delivery of vehicles; notices regarding the location of vehicles; and similar communications. *Reliable Volkswagen* at 153–54.

any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation.

15 U.S.C. § 1221(d). Noticeably absent from this definition is defendant's principal place of business—the Commonwealth of Puerto Rico. As a commonwealth, Puerto Rico is neither a state nor a territory. Plaintiff claims that Congress must have inadvertently omitted Puerto Rico from the definition and could not have intended to make the Act inapplicable to Puerto Rico. In that regard it is also arguable that Congress did not omit the Commonwealth by oversight. In looking at other commerce statutes, Congress has used language to include the Commonwealth.[41] Puerto Rico was granted its Commonwealth Status in 1952; the federal dealer act was enacted in 1956. Therefore, it can further be contended that had Congress wanted the Act to include the Commonwealth in its definition of Commerce it could have so done, and that accordingly, Motorambar is not engaged in commerce as defined by § 1221(d). But this Court need not specifically reach that issue or base its holding herein on lack of "commerce" in order to decide defendant Motorambar's pending summary judgment motion. Rather, based on each of the other reasons stated *supra*, at pages 12–17, this Court will grant summary judgment in favor of defendant Motorambar with regard to Count I.

■■■ (8) As discussed *supra*, at ¶ 6, plaintiff, Mr. Gassett, cannot personally raise claims which are derivative of the harm suffered by the corporation. As to the corporation, its allegations in Count II were dismissed by this Court in its Memorandum and Order of October 27, 1994 as set forth *supra*, at ¶ 3, of this Memorandum and Order. Assuming, *arguendo* only, that Mr. Gassett, as the individual plaintiff can assert such a claim, he is barred from so doing by the statute of limitations.[42] The Virgin Islands Franchised Business Act requires an action to be commenced within two years after the cause of action arises.[43] 12A V.I.C. § 136. In his deposition, Mr. Gassett's testimony makes it clear he was aware that a cause of action arose on or before May 13, 1991 when he informed Motorambar that he believed the termination to be unlawful.[44] The instant action was filed in June, 1993, more than two years after the claim accrued. As a general rule, "a statute of limitations begins to run upon occurrence of the essential facts which constitute the cause of action." *Simmons v. Ocean*, 544 F.Supp. 841, 843 (D.V.I.1982). It could be argued that the causes of action alleged in Count II by both plaintiffs actually arose upon notification of termination (March 11, 1991) or initial response thereto (March 18, 1991). Regardless of whether either of the March dates or the May date is used, the statute of limitations had expired by the time the instant action was filed in June 1993 as to each and both of the plaintiffs. Therefore, Motorambar is entitled to the grant of its summary judgment motion with respect to the claims of both plaintiffs in Count II, on limitations grounds, even if no other bases for such grant existed—which they do for the independent reasons indicated *supra*.

(9) On April 7, 1994, Motorambar filed a motion to dismiss Count III for failure to state a claim. This Court, in an August 8, 1994 Memorandum and Order, held that motion *sub curia*. During the discovery process, plaintiffs informed Motorambar that plaintiffs were proceeding in Count III under the federal antitrust laws, particularly 15 U.S.C. § 13(e), which states:

It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to fur-

---

**41.** *See* 15 U.S.C. § 12 "Commerce [includes] ... places under the jurisdiction of the United states;" 15 U.S.C. § 1214 "[i]nterstate commerce includes ... the Commonwealth of Puerto Rico."

**42.** Limitations is pled as an affirmative defense in defendant's answer, and is also relied upon by defendant in support of its summary judgment motion.

**43.** The Virgin Islands statute defines franchise differently from the Automobile Dealers Day in Court Act. *See* 12A V.I.C. § 130(2). However, whether a franchise existed with respect thereto is irrelevant as Mr. Gassett's claim is time barred.

**44.** *See* Deposition of Mr. Gassett at 202–3.

nish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, servicing, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

The above referenced statute is commonly referred to as the Robinson–Patman Anti-Discrimination Act. Plaintiffs contend that Motorambar violated the statute by discriminating in the delivery of vehicles.[45]

■ Section 13(e) does not apply to discrimination in or refusal to deliver. "The overwhelming view ... is that delivery is not a service or facility within the meaning of [section 13(e)]...." *L & L Oil Co. v. Murphy Oil Corp.*, 674 F.2d 1113, 1119 (5th Cir. 1982); *Cemar, Inc. v. Nissan Motor Corp.*, 678 F.Supp. 1091, 1102–03 (D.Del.1988).

■ Plaintiffs cite *Centex–Winston Corp. v. Edward Hines Lumber Co.*, 447 F.2d 585 (7th Cir.1971), *cert. denied* 405 U.S. 921, 92 S.Ct. 956, 30 L.Ed.2d 791 (1972) in support of their claim. In *Centex–Winston*, the Seventh Circuit reversed the district court's dismissal of a complaint which alleged delay in the delivery of lumber to the plaintiff but prompt delivery to plaintiff's competitors. *Id.* at 586. While the court allowed the claim to proceed, it cautioned that the plaintiff had to prove that "the favored customers [were] competitors of the plaintiff." *Id.* at 588. However, *Centex–Winston* has been "distinguished and rejected by other courts." *L & L Oil*, 674 F.2d at 1118.[46] In *Cecil Corley Motor Co. v. General Motors Corp.*, 380 F.Supp. 819 (M.D.Tenn.1974) the court discussed the legislative history of the Robinson–Patman Act and determined "that allocations and timeliness in deliveries of product are not in the purview of Section 13(e)" *Id.* at 848. The court also suggested that the Seventh Circuit appears to have adopted a "more precise reading of the Act" since *Centex–Winston* was adopted. *Id.* at 851 (*citing Kirby v. P.R. Mallory & Co., Inc.*, 489 F.2d 904 (7th Cir.1974)). Further, it is to be noted that the provisions of § 13(e) relate to

the "resale of the product by the purchaser as opposed to the original sale from the supplier to the purchaser." *Morris Electronics of Syracuse, Inc. v. Mattel, Inc.*, 595 F.Supp. 56, 64 (N.D.N.Y.1984). In this case it seems that the essence of the conduct of which plaintiffs complain is that Motorambar did not sell GSI all of the vehicles which GSI wanted to buy. However, there is no apparent connection between GSI's desire to purchase certain vehicles and any services or facilities involved with the resale of vehicles by GSI to customers of the latter.

Plaintiffs cite to *Fox v. Mazda Corp. of America*, 868 F.2d 1190 (10th Cir.1989) to support their position under Count III. *Fox* involved a Mazda distributor which provided dealers with the highly sought Mazda RX–7 in proportion to the number of less sought Mazda GLC's which the dealer sold. However, new dealerships received the RX–7 without regard to GLC sales. *Fox Motors, Inc. v. Mazda Distributors (Gulf), Inc.*, 806 F.2d 953, 956 (10th Cir.1986) (involving a prior appeal to the Tenth Circuit in this same litigation). The court found this distribution scheme to be valid under the anti-trust laws and reversed the lower court's judgment because the scheme fostered sales and competitive prices. *Id.* at 958–59. The court also determined, however, that an inference of bad faith under the federal dealer act could be drawn by the distribution scheme which favored new dealers over established dealers. *Id.* at 960. Missing from the instant case, however, is the *Fox* linchpin—a distribution scheme which allegedly favors one group over another by "maldistribution." *Fox*, 868 F.2d at 1192.

As stated *supra*, plaintiffs complain that GSI did not receive the Nissan vehicles which GSI wanted. In the complaint, plaintiffs allege that "an unfairly low number of Nissan vehicles [were allocated] to dealers who carried other brands of vehicles...."[47] Courts have long recognized that simple refusal to deal with or sell to plaintiffs, standing alone, is not a violation of any provisions of the antitrust laws. *United States v. Col-*

---

**45.** *See* Deposition of Gassett at 203–212.

**46.** *See also Cemar,* 678 F.Supp. at 1102.

**47.** *See* Second amended complaint at ¶ 33.

gate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919).[48] A refusal to deal is a violation of the antitrust laws "when it produces unreasonable restraint of trade, such as price fixing, elimination of competition, or creation of monopoly." *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1192 (5th Cir.1978). Such a restraint on trade and competition is one of the central underpinnings of anti-trust law. Plaintiffs' complaint contains no such allegations; nor is such an inference raised in plaintiffs' opposition to summary judgment or by any evidence proffered by plaintiffs. In that context, defendant Motorambar is entitled to the grant of its summary judgment motion with respect to Count III.

■ (10) Count IV centers around BNS's decision not to honor the sight draft dated November 15, 1990. When GSI filed for bankruptcy protection on November 16, 1990, GSI became the debtor in possession of the bankrupt estate. Once the bankruptcy petition was filed, GSI did not have the authority to draw funds under the floor-plan financing agreement. As GSI could not draw against the floor-plan financing agreement, it had no funds with which to honor the November 15, 1990 sight draft. *See In re: Swift Aire Lines, Inc.*, 30 B.R. 490, 495–96 (Bankr. 9th Cir.1983).

Additionally, 11 U.S.C. § 365(c) provides:

The trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties if ... (2) such a contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

Under that section, loan commitments and letters are non-assignable and may not be assumed by the trustee or by the debtor in possession. Similarly, the flooring agreement between BNS and GSI is a financial accommodation and is, therefore, non-assignable under § 365(c)(2). *See In re: Sun Runner Marine, Inc.* 945 F.2d 1089, 1091–92 (9th Cir.1991). In *In re: New Town Mall,* the court stated: "[T]here is no way that a debtor can assume such an agreement and thus compel its lender to continue to advance funds during a reorganization ..." 17 B.R. 326, 328 (Bankr.D.S.D.1982) (*quoting* Levit "Use and Disposition of Property Under Chapter 11 of the Bankruptcy Code: Some Practical Concerns," 53 A, Bankr.L.J. 275, 276 (1979)). At an earlier point in this Memorandum and Order,[49] this Court concluded that the summary judgment record in this case shows that the sight draft was presented after the bankruptcy petition had been filed, *i.e.* on or after November 16, 1990. In that regard, the record discloses that the sight draft was mailed on November 15, 1990 from Puerto Rico. Accordingly, its arrival in St. Thomas at the office of BNS would seemingly not be expected before November 16, 1990. On that latter date, *i.e.* the date upon which GSI filed its petition in bankruptcy, neither GSI nor Mr. Gassett could require BNS to honor the November 15, 1990 sight draft or to advance monies under the flooring arrangement. On the other hand, if the November 15, 1990 sight draft had been received by BNS before GSI filed its petition in bankruptcy, then seemingly BNS would have been required to honor it. But that is not what is factually established by the within record.[50]

For each and all of the reasons set forth *supra*, BNS is entitled to the grant of its summary judgment petition with respect to Count IV.

(11) Several motions pled by defendants remain outstanding in this case. As this Court is granting summary judgment in favor of defendants with respect to each and all of plaintiffs claims, defendants' said motions, pled November 3, 1994 as *in limine* motions, are hereby rendered moot.[51] Additionally,

---

48. *See also Brosious v. Pepsi–Cola Co.*, 155 F.2d 99, 102 (3d Cir.1946).

49. *See* page 978, *supra.*

50. *See* the discussion, *supra,* at pages 977–978 of this Memorandum and Order.

51. In that context, defendants moved both to exclude evidence protected by the attorney client

on September 27, 1994, defendant Motorambar moved for sanctions due to plaintiffs' failure, at that time, to comply with certain discovery requests. Those discovery requests have apparently now been met. Under the circumstances, this Court will not impose sanctions in that regard.

(12) In accordance with the foregoing, summary judgment is hereby GRANTED in favor of defendants as to each and all claims asserted in this case by plaintiffs; judgment with respect thereto will be entered for defendants in a separate Order of even date herewith.

## APPENDIX I

### *MEMORANDUM AND ORDER*

(1) After consideration of all filings in this case, including plaintiffs' references to Judge Giles' views as stated in *Commercial Development Corp. v. Xtra Super Food Centers, Inc., et al.,* Civil No. 1990/222, dated December 4, 1991, this Court concludes that the corporate plaintiffs' motion for reconsideration of dismissal based on lack of corporate good standing should be granted and that no part of Count 2 of the complaint shall be dismissed.

(2) Reference is also hereby made to this Court's August 8, 1994, Memorandum and Order. That Memorandum and Order, including the discovery schedule referred to therein, remains in full force and effect, except for the change indicated by paragraph (1) *supra.*

(3) Copies of this Memorandum and Order are today being mailed to counsel of record.

(4) It is so ORDERED this 17th day of August, 1994.

/s/ Frank A. Kaufman
Senior United States District Judge

## APPENDIX II

### *MEMORANDUM AND ORDER*

(1) Reference is hereby made to Mr. Miller's October 19, 1994, letter to Ms. Carpenter. This Court notes the dismissals specified therein.

privilege and to exclude expert testimony and

(2) On August 17, 1994, and in prior documents filed by this Court in this case, this Court addressed the question of whether or not the allegations of plaintiffs in Count II of plaintiff's complaint should be dismissed because of the past failure of plaintiff GSI, Inc. to pay corporate taxes and because of the running of the statute of limitations, and concluded, that no part of Count II of the complaint should be dismissed for such reasons. On August 17, 1994, the attention of this Court had not been called to Judge Fulham's September 1, 1992, and March 3, 1993, filings in *Celebrate and Party In Class, Inc. v. Banco Popular de Puerto Rico,* Civil No. 1990–116. Copies of those documents are being placed in the court file in this case. They were brought to the attention of this Court recently in another case pending in this Court.

(3) On August 17, 1994, this Court reached its conclusion, that no part of Count II of the complaint should be dismissed, with considerable doubt, but followed what it understood to be the outstanding case law of this Court. Now, however, in view of Judge Fulham's aforementioned determinations in *Celebrate and Party* and Judge Fulham's clear holding concerning the status of the decisional of law of this Court, this Court hereby reverses its decision set forth in its aforementioned August 17, 1994, Memorandum and Order, and hereby dismisses Count II of the complaint in this case. While the need for that decision with respect to the claims against one of the defendants, namely Nissan N.A., Inc., is rendered moot by the dismissal referred to in paragraph (1) *supra* of this Memorandum and Order, that need is present with respect to the claims of plaintiffs against the other defendants. Accordingly, Count II of plaintiffs' complaint is hereby dismissed, with prejudice, for the reasons discussed *supra* in this Memorandum and Order.

(4) Copies of this Memorandum and Order have today been faxed to counsel of record. Copies of the same are also being sent by mail to counsel of record and the original of the same is being sent to the Clerk of the Court for filing in the official court file of this case.

other evidence of damages.

(5) It is so ORDERED this 27th day of October, 1994.

/s/ Frank A. Kaufman
Senior United States District Judge